## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                                    )
**ALI ASGHAR,**                                     )
                                                    )
                              **Plaintiff,**         )
                                                    )
**v.**                                              )
                                                    )        **Civil Action No. 06-0400 (RJL)**
**HENRY M. PAULSON, Jr., Secretary,**               )
**Department of Treasury,**                         )
                                                    )
                              **Defendant.**         )
_____)

### <u>MOTION TO DISMISS OR FOR SUMMARY JUDGMENT</u>

Pursuant to Rules 12(b)(6) and 56, Federal Rules of Civil Procedure, defendant respectfully submits this Motion to Dismiss or, In the Alternative, for Summary Judgment pursuant to Fed. R. Civ. P. 56. As set forth in the Memorandum of Points and Authorities in support of this motion, plaintiff has failed to state a claim upon which relief can be granted. Alternatively, there are no material facts in genuine dispute and defendant is entitled to judgment as a matter of law. Wherefore, plaintiff respectfully requests that plaintiff's complaint be dismissed with prejudice or summary judgment entered in defendant's behalf.

Respectfully submitted,

_____/s/_____
JEFFREY A. TAYLOR , Bar # 498610
United States Attorney

_____/s/_____
RUDOLPH CONTRERAS, Bar # 434122
Assistant United States Attorney

_____/s/_____
CLAIRE WHITAKER, D.C. Bar # 354530
Assistant United States Attorney
United States Attorneys Office
Civil Division
555 4th Street, N.W., Room E-4204
Washington, D.C. 20530
(202) 514-7137

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                          )

**ALI ASGHAR,**                      )

             **Plaintiff,**       )

**v.**                                  )       **Civil Action No. 06-0400 (RJL)**

**HENRY M. PAULSON, Jr., Secretary,** )
**Department of Treasury,**        )

             **Defendant.**      )
_____)

### MEMORANDUM OF POINTS AND AUTHORITIES IN
### SUPPORT OF DEFENDANT'S MOTION TO DISMISS OR,
### IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

Plaintiff Ali Asghar, a Currency Checker Processor with the Department of Treasury's Bureau of Engraving & Printing ("BEP") alleges that he was the victim of discrimination and retaliation based on his national origin, race/color and sex, when he, a native of Afghanistan, took a lengthy leave of absence from his job to visit Afghanistan in 2004 [from mid July to November 2004 - the second in 2004], and, upon his return, was prevented from returning to work, pending a security investigation [from November 8-26, 2004]. R. 1 at ¶¶ 8-14, 15. Two other claims alleged by plaintiff, *i.e.*, discrimination based on religion, and a hostile work environment during the same period based on a singular event in January 2005, were alleged below and discussed at plaintiff's deposition, but were not identified as claims in his complaint before this Court.

As more fully set forth below, plaintiff has failed to establish a *prima facie* case of discrimination, retaliation or hostile work environment. With regard to his discrimination claims, in addition to failing to show an adverse personnel decision, there

were straightforward, legitimate, nondiscriminatory reasons for the actions taken that

were not pretext for discrimination , which were taken in furtherance of BEP security

policies.  As to plaintiff's retaliation claim, there is no causal connection between

plaintiff's previous EEO activity in 1996-1998, 1999-2000, and his EEO complaint in

November 2004 through early January 2005.  Finally, plaintiff cannot establish a *prima*

*facie* case of hostile work environment at any time during 2004 through early January

2005, when plaintiff sought EEO counseling.  Indeed, plaintiff had little or no contact

with those he identifies as the harassers.  Accordingly, plaintiff's complaint should be

dismissed or, in the alternative, summary judgment entered in defendant's behalf.

## I.     FACTUAL BACKGROUND

Plaintiff pursued independent EEO matters with the BEP between 1996-1998 and

1999-2000 which were resolved prior to January 2001.  R. 1. at ¶ 8; see also Attachment

2 at p. 2 and Attachment 4 at p. 1 (Answer #5).  The subject matter of this law suit

involves a November 2004 claim of discrimination/retaliation based on plaintiff's race

(Afghanistan), religion (Muslim), sex (male) and in retaliation for his prior EEO activity

and harassment.  Attachment 1 at 1-2 .[1]  Plaintiff was counseled by a BEP EEO counselor

on January 10, 2005, and, on February 18, 2005.  He filed a formal EEO Complaint on

March 1, 2005 (received on March 4, 2005), with the Department of the Treasury,

Washington Regional Complaint Center ("RCC").  Attachment 2 at p. 2 (alleging race

---

[1] As noted above, plaintiff omitted his religious discrimination claim from his complaint.
As he has failed to establish any claim for discrimination, should he move to amend his
complaint to include discrimination based on religion, defendant submits that this claim
should be dismissed with the others based on the arguments and supporting evidence
presented here.

(Asian), religion (Muslim), national origin (Afghanistan), and retaliation (Dec. 1998 -

Jan. 2001).  Id.  The RCC accepted plaintiff's claim as described below:

  . . . .[that he was] subjected to harassment, based on his race (Asian), national origin
   (Afghanistan), religion (Muslim), and reprisal for prior EEO Complaint activity
when:

> (1) on November 8, 2004, he was questioned by a security officer,
> escorted out of the building, advised to not return until contacted by
> security and told the reason for the investigation was because he might be
> involved with a terrorist group;
> (2) on November 23, 2004, at the request of the BEP, an FBI agent visited
> him at his home;
> (3) on November 26, 2004, his supervisor remarked that the reason that
> she called security on him was because he 'might bring a bomb into the
> building because he is a terrorist:' and
> (4) on January 4, 2005 his supervisor made a derogatory comment in front
> of his coworkers, referencing his wife and his trip to Afghanistan?

Attachment 3 at 1.

The facts underlying plaintiff's claims are as follows:  Plaintiff visited

Afghanistan twice during several months in 2004.  Request for Admissions at No. 1

(Attachment 5).[2]   The first trip was from March 15, 2004, to June 1, 2004; the second

trip was from July 15, 2004 to November 2004.  Attachment 4 (Affidavit of Ali Asghar)

at p. 3, see also Attachment 6 (leave slip).  His leave slip for the second trip explained

that he needed to return to Afghanistan for some family matters.  Attachment 6.  This

was approved by Antoine Johnson, one of his supervisors. Attachment 10 (Deposition of

Felicia Jackson), p. 27, lines 3-11.[3]   He "told [another supervisor, Felicia Jackson] that

---

[2] Plaintiff failed to timely file his responses to Defendant's Requests for Admissions.
Although they may be deemed admitted by this Court, plaintiff's answer to this
admission was "Admit."

[3] At the time, plaintiff had three first line supervisors: (1) Mr. Antoine Johnson, (2) Aaron
Alexander, and (3) Felicia Jackson. Attachment 11 (Asghar Deposition), p. 162, lines 10-

[his] mother was ill . . ." Attachment 4 (Asghar Affidavit) at p. 5.[4]

Ms. Jackson alerted her second line supervisor, Mr. James Brent, about plaintiff's extended travel when she discovered that plaintiff had told Mr. Johnson something else. Attachment 10 (Jackson Deposition) at p. 27, lines 3-11; p. 35, lines 2-18; p. 36, lines 7-17; p. 43, lines 5-18.   Mr. Brent notified the Office of Security about plaintiff's foreign travel pursuant to BEP policy.  Attachment 7 (Deposition of James Brent), p. 22, lines 6-21; p. 23, lines 1-15; see also Attachment 8 (Deposition of Glen Alonso), p. 57 at lines 13-21 and p. 58, lines 1-6 & Attachment 9 (attached email from Brent).  At Security's request, Mr. Brent queried either Ms. Jackson or Mr. Johnson about the reasons for plaintiff's travel, learned it was taken because of a "sick" parent, and conveyed that information to the Security Office.   Attachment 7 (Brent Deposition) at p. 24, lines 1-21; p. 25, lines 1-4; Attachment 9 (email record).

It was the practice of the Office of Security to investigate individuals who were out of the office on extended leave to a foreign country. Attachment 8 (Deposition of Glenn Alonso) at pp. 13, lines 16-19.   Indeed, there was a requirement to report extended travel to foreign countries by employees to the Office of Security.  Id. at p. 56, lines 2-21.

_____

14.  His second line supervisor was Assistant Chief Robert Bernhart. Id. at lines 15-18. James Brent was his third line supervisor.  Id. at 18-22.  He alleges only that Ms. Jackson and Mr. Brent are the alleged discriminatory officials. Id. At p. 74, lines 8-14.

[4] Plaintiff may attempt through his deposition testimony or belated answers to admissions to deny that he ever said the reason for his second trip was his ill mother.  See e.g., Attachment 11 at p. 121, lines 20-22 though p. 122, line 1.  However, his affidavit found at Attachment 4, hereto, shows clearly that this was the reason he related to Ms. Jackson for his trip between July 15, 2004, and November 8, 2004. See Attachment 4 at p. 3 and p. 5.  In fact, at p. 5, in Answer #9, he states "I told [Ms. Jackson] that my mother was ill" and then in parenthesis adds "(this was my stepmother and I have always referred to her as my mother)."

As Special Assistant to the Chief of the Office of Security, Mr. Glen Alonso handled

special investigations.  Therefore, he followed-up with Mr. Brent and learned that

plaintiff had traveled to Afghanistan to attend to his sick mother, who was "critically ill,

suffering from cancer, and was not expected to live. . ." Id. at p. 12, lines 7-20; p. 15,

lines 1-20.  Mr. Alonso then pulled plaintiff's security folder and discovered that

plaintiff's mother was deceased. Id. at 16, lines 3-18.  This made him "suspicious." Id. at

line 18.  This was of particular concern as the report regarding plaintiff's sick mother

came from two separate sources, Ms. Jackson and Mr. Bernhart, his second line

supervisor. Id. at p. 16, line 18; p. 17, lines 1-12; see also Id., p. 48, lines 18-21.[5]  Mr.

Alonso determined that under these circumstances an investigation into the matter was

warranted.  See Attachment 8 (Alonso Deposition) at pp. 12-18, 24-29.  However, Mr.

Alonso's testimony shows he was struggling with what to do:

> – I was struggling, because I knew him.  I felt I knew him; I felt I'm a
> good judge of character.  But the fact that the information pertaining to his
> mother, the fact that she had already been deceased and the fact that his
> wife worked at the airlines and the fact that he had made – this was his
> second trip over there, the fact that several of the countries that he had
> visited previously, where he had stated he had visited, were countries that
> came in different intelligence reports for gathering places for terrorists
> groups.
>       So, yeah, I struggled with the idea, and could he have been [a
> terrorist]?  He could very well have been.  My job was the security of the
> bureau, and I was going to look out for people and the bureau, so I did
> what I had to do as far as investigating the case.

Id. at p. 48, lines 18-21, and p. 49, lines 1-15.

---

[5] An email from Mr. Bernhart to Mr. Alonso and copies to Mr. Brent notes that Mr.
Bernhart spoke to plaintiff regarding his leave of absence request.  The email reflects that
during the conversation(s), plaintiff informed Mr. Bernhart that "he needed the time off
due to the fact that his mother had terminal cancer and that he needed to assist her in her
care."  Attachment 8 (Alonso Deposition) at pp. 59-60.

Plaintiff requested leave through December 31, 2004. However, plaintiff returned early to the BEP building to visit the credit union during the week of November 1, 2004, and, then again on about November 8, 2004. See Attachment 4 (Asghar Affidavit) at 3, see also Attachment (Asghar's leave request through 12/31/07). Plaintiff alleges that the second visit to the BEP was ostensibly to report to work. On this visit, plaintiff was unable to gain access to the building by using his entry badge because it had been "redlined." Id. at 3-4; Attachment 11 (Asghar Deposition at p. 130, lines 4-10; Attachment 9 at p. 6 (describing redlining). When plaintiff attempted to enter the building, Mr. Alonso met him and escorted him to the credit union, and then to his (Mr. Alonso's) office for an interview. See Attachment 11 (Asghar Deposition) at p. 130, lines 12-15 and Attachment 9 (Alonso Affidavit) at p. 2.

During the interview, Mr. Alonso informed plaintiff that the interview was based upon his recent travels abroad, and it was intended to discern whether he had any contacts or propositions requesting favors or entry into the U.S. while he was in Afghanistan. Attachment 11(Asghar Deposition) at p. 130, lines 19-22, 131, lines 1-5. Mr. Alonso's notes reflected that plaintiff did not plan to return to work until January 6, 2005, which was after his investigation would be completed. Attachment 8 (Alonso Deposition) at p. 37, lines 17-21; p. 38, lines 1-6; p. 41, lines 19-21; p. 42, lines 1-9; p. 43, lines 11-21, p. 44, lines 1-21; p. 46, lines 10-15. Mr. Alonso's notes and related emails are attached to the his affidavit found at Attachment 9.

At the conclusion of the interview, Mr. Alonso advised plaintiff that the FBI would be contacting him regarding his recent travel to Afghanistan. Plaintiff inferred to Mr. Alonso that this was not a problem because he [plaintiff] did not intend to return to

work until January 6, 2005.  Attachment 8 (Alonso Deposition), p. 37, lines 14-21; p. 38, lines 1-6; <u>see</u> <u>also</u> Attachment 9 (Alonso Affidavit) at p. 2 and attached notes.   An FBI agent visited plaintiff's home on or about November 23, 2004 to interview him. Attachment 4 at 4; <u>see</u> <u>also</u> Attachment 9 (Alonso Affidavit) at p. 5.  The FBI interview lasted about 45 minutes. R. 1 (Complaint) at ¶ 13; Attachment 11 (Asghar Deposition) at p. 150, lines 13-22 & p. 151, lines 1-2.

On about November 26, 2004, an FBI agent informed Mr. Alonso that the FBI investigation was complete, plaintiff was fine and "good to go."  Attachment 8 (Alonso Deposition) at p. 46, lines 20-21; p. 47, lines 1-3.  Mr. Alonso immediately notified plaintiff that he could return to work at the Bureau. <u>Id</u>. at p. 47, lines 7-13; R. 1 (Complaint) at ¶ 14.  Plaintiff returned to work on November 29, 2004.  <u>Id</u>. at ¶ 14. Thus, he was "redlined" and could not enter the building without an escort from the first week of November to November 26, 2004 (while he was still on leave - scheduled through December 31). <u>See</u> Attachment 6; Attachment 8 at p. 41, lines 13-21, <u>see</u> <u>also</u> p. 42, lines 1-9; Attachment 11 (Asghar Deposition), p. 253, lines 2-21.

Plaintiff worked from Monday, November 29, 2004, until the Christmas shutdown (approximately three weeks). Attachment 11 (Asghar Deposition) p. 145, lines 12-19; p. 147, lines 1-22; p. 148, lines 1-8.  He returned to work the first week of January 2005.  He sought counseling on January 10, 2005.  Attachment 1 at p. 1.

Plaintiff's claims before this Court emanate from his embarrassment surrounding the security investigation, and the actions of Ms. Jackson and Mr. Brent in referring him to the Office of Security.  It is his understanding that Ms. Jackson identified him as a "suspected terrorist." Attachment 11, p. 165, lines 15-22; p. 166, lines 1-22 through p.

167; see also p. 175, lines 10-22, 176-177.  Although he has no direct knowledge of the

alleged discriminatory/retaliatory conduct, he believes that the Chief of the Office of

Security (Mr. Lindsey), Ms. Jackson and Mr. Brent discussed the matter and concluded

that "I'd probably be a terrorist and bring a bomb in here and blow up every body."  Id.,

p. 169, 3-14.  He makes no claims against his co-workers. Id. p. 176-177.

         Plaintiff alleges two separate incidents which he offers as evidence of his claims.

One involves a singular incident by a co-worker, Kevin Lee, who called plaintiff

"Chemical Ali" at some undefined time. Attachment 11 (Asghar Deposition), p. 146,

lines 8-16; p. 180, lines 10–22; 181, lines 1-11.  Plaintiff testified that his co-worker(s)

may have been teasing, but it was not teasing to him. Id., p. 181, lines 12-22.

         The second one occurred on January 4, 2005.  Attachment 3 at 1.  Ms. Jackson

made an admittedly inappropriate comment to plaintiff about the possibility that his

wife's pregnancy was the result of someone other than him.  She said  "Well, Mr.

Asghar, you was gone a long time.  You know what they said, 'Momma's baby, Poppa's

maybe.'" Attachment 10 (Jackson Deposition), p. 72, lines 11-21; p. 73, line 1.  Ms.

Jackson apologized to plaintiff. Id. at p. 73, lines 11-21, p. 74, & p. 75, line 1-10; see also

Request for Admissions at #15.  She had joked with him before. Id. at p. 74, lines 11-16.

Mr. Brent later counseled her and directed that she go to training. Attachment 7 (Brent

Deposition) at p. 41, lines 4-21.

### III.  ARGUMENT

### A.    Standard of Review.

#### 1.  Fed. R. Civ. P. 12(b)(6).

Fed. R. Civ. P. 12(b)(6) provides, in pertinent part: "failure to state a claim upon

which relief can be granted" is a ground for dismissal of a claim.

"[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Thomas v. City Lights School, Inc., et al., 124 F.Supp.2d 707, 708 (D.D.C. 2000) (quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)). Plaintiff's factual allegations must be accepted as true when reviewing the adequacy of the complaint pursuant to Fed. R. Civ. 12(b)(6). Hill v. City of New York, 45 F.3d 653, 657 (2d Cir. 1995). A Rule 12(b)(6) motion may be converted into a summary judgment motion pursuant to Fed. R. Civ. P. 56 when matters outside the pleadings are considered.

## 2.  Fed. R. Civ. P. 56 (Summary Judgment Standard).

Under Fed. R. Civ. P. 56, a motion for summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show that there is no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-250 (1986).

Although in considering a motion for summary judgment the court must draw all justifiable inferences in favor of the non-moving party, id. at 255, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). When the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue of fact. Scott v. Harris, _ U.S. _, 127 S. Ct. 1769 (April

30, 2007) (finding that it was improper for the lower court to view facts in the light most favorable to the nonmoving party where those facts were clearly contradicted by the record and accordingly did not raise a genuine issue of fact).

Thus, the nonmovant cannot simply rely on "metaphysical doubt as to the material facts." Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Nor can the nonmovant's "conjecture and surmise [or] mere 'conclusory allegations of discrimination, without more' [be] sufficient to defeat a motion for summary judgment." Carney v. American University, 960 F. Supp. 436, 439 (D.D.C. 1997) (quoting Grigsby v. Reynolds Metals Co., 821 F.2d 590 (11th Cir. 1987). A plaintiff must present substantial and credible evidence of discrimination to survive a motion for summary judgment. See Greene v. Dalton, 164 F. 3d 671, 675 (D.C. Cir. 1999) ("accepting [some] conclusory allegations as true, therefore, would defeat the central purpose of the summary judgment device, which is to weed out those cases insufficiently meritorious to warrant the expense of a jury trial."); Carpenter v. Federal Nat'l Mortgage Ass'n, 165 F. 3d 69, 72 (D.C. Cir. 1999) (if plaintiff merely shows that the legitimate nondiscriminatory reason offered by the employer is a pretext for a decision intending to cover up an unsavory reason – but one that is not illegal under the antidiscrimination law, the plaintiff is not entitled to try issues of fact, and summary judgment for the employer is appropriate). A plaintiff must establish "that a reasonable jury could conclude . . . that the adverse employment decision was made for a discriminatory reason." Lathram v. Snow, 336 F.3d 1085, 1088 (D.C. Cir. 2003). Moreover, "the inquiry involved in ruling on a motion for summary judgment… necessarily implicates the substantive evidentiary standard of proof that would apply at

the trial on the merits." <u>Anderson</u>, 477 at 252.

In a Title VII discrimination case, the applicable analytical framework is the three-stage, burden-shifting test set forth by the Supreme Court in <u>McDonnell Douglas v. Green</u>, 411 U.S. 792 (1973).  Under this test, the plaintiff must initially prove by a preponderance of the evidence a *prima facie* case of unlawful discrimination.  If the plaintiff makes this showing, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions.  If the employer makes this showing, the burden then returns to the plaintiff to show that the employer's reason is pretextual. <u>Texas Dept. of Community Affairs v. Burdine</u>, 450 U.S. 248, 253 (1981); <u>St. Mary's Honor Center v. Hicks</u>, 509 U.S. 502 (1993).  The ultimate burden of persuasion remains at all times on the plaintiff to prove that the employer intentionally discriminated against her. *Burdine*, 450 U.S. at 253.  Accordingly, a summary judgment decision is appropriate when the undisputed facts show: (1) that the plaintiff has failed to establish a *prima facie* case of discrimination; or (2) the plaintiff has failed to present probative evidence that the defendant's stated legitimate reasons for its actions were a pretext for discrimination.

The Court is also alerted to the holding in <u>Fogg v. Gonzales</u>, 492 F.3d 447 (D.C. Cir. 2007), wherein the D.C. Circuit held, *inter alia*, that the 1991 amendments to Title VII codified two alternative ways of establishing liability for intentional discrimination: (1) a single motive theory requiring that the plaintiff establish that discrimination was the "sole" or "but for" reason for the challenged employment action; and (2) a "mixed-motive" theory requiring only that the plaintiff demonstrate that discrimination played a "motivating part" or was a "substantial factor" in the employment decision.  <u>Id.</u> at 451.

Under either theory, plaintiff must demonstrate discrimination by a preponderance of the evidence[6] and may rely on direct or circumstantial evidence to meet that burden.  Desert Palace, Inc. v. Costa, 539 U.S. 90, 92-102 (2003).

In the absence of direct evidence, plaintiff may attempt to establish that he was the victim of intentional discrimination on the basis of his race by relying on circumstantial evidence analyzed using the scheme first set forth in McDonnell-Douglas Corp. v. Green, supra.[7]  As noted above, under that scheme, the plaintiff must first, by a preponderance of the evidence, establish a prima facie case of discrimination.  See St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506 (1993).  If the employee succeeds, the employer then must introduce evidence of a legitimate, nondiscriminatory reason for its action.  See McDonnell Douglas, 411 U.S. at 802.  Once it is established that both parties have met their respective burdens of production (i.e., plaintiff by presenting a prima facie case and defendant by producing a non-discriminatory reason for its actions), the burden shifting scheme becomes irrelevant.  Hicks, 509 U.S. at 510.  Then, the plaintiff must establish, by a preponderance of the evidence, that "race, color, religion, sex, or national origin was a motivating factor for any employment practice."  Desert Palace, Inc. v. Costa, 539 U.S. 90, 101 (2003) (citing 42 U.S.C. § 2000e-2(m)).

Alternatively, plaintiff can meet the ultimate burden by demonstrating that the

---

[6] "Preponderance of the evidence" means such evidence as, when weighed against that opposing it, has the more convincing force that something is so.  Hopkins v. Price Waterhouse, 737 F. Supp. 1202 (D.D.C. 1990), aff'd 920 F.2d 967 (D.C. Cir. 1990); Metropolitan Stevedore Company v. Rambo, 521 U.S. 121, 137 n.9 (1997).  "[W]hen the evidence is evenly balanced, the [party with the burden of persuasion] must lose."  Id.

[7] Reliance on the McDonnell Douglas scheme for testing the viability of plaintiff's circumstantial evidence is not limited to the "single-motive" theory of liability.  See Fogg v. Gonzales, 492 F.3d 447, 451 n.*

defendant's legitimate, non-discriminatory reason is a pretext and that discrimination is the "but for" reason for the challenged employment action. St. Mary's Honor Center, 509 U.S. at 515-518. This a more difficult standard than the requirement under Section 2000e-2(m) to show that discrimination was a motivating factor. In the single motive case, in Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 148 (2000), Justice O'Connor recognized occasions where summary judgment would be appropriate:

> Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory. For instance, an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.

Defendant submits that whichever standard is employed here, plaintiff fails to meet his burden of coming forward with evidence to create a triable issue.

### B.    Standard for *Prima Facie* Case of Discrimination. Based on Race, National Origin, Sex and Religion.

The Supreme Court has explained that the elements of a prima facie case of discrimination may differ from case to case. Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 253 n.6 (1981). As a general matter, to establish a prima facie case of discrimination, a plaintiff must demonstrate by a preponderance of the evidence that (1) he was a member of a protected group, (2) an adverse employment action took place, and (3) that the surrounding circumstances give rise to an inference of discrimination. Burdine, supra; Stella v. Mineta, 284 F.3d 135, 144-45 (D.C. Cir. 2002)(discrimination: *citing* McDonnell Douglas, 411 U.S. at 802); Mitchell v. Baldrige,

13

759 F.2d 80, 86 (D.C. Cir. 1985) (retaliation: *quoting* McKenna v. Weinberger, 729 F.2d

783, 790 (D.C. Cir. 1984). Thereafter, the motivating factor/pretext analysis described

above must take place. The burden rests on the plaintiff at all times. Hicks, 509 U.S. at

507; Aka v. Washington Hospital Center, 156 F.3d 1284, 1288 (D.C. Cir. 1998) (en

banc).

**C.     Standard for a *Prima Facie* Case of Retaliation.**

To prevail on a retaliation claim, a plaintiff must follow the *McDonnell Douglas*

framework. Morgan v. Fed. Home Loan Mortgage Corp., 328 F.3d 647, 651 (D.C. Cir.

2003). As noted above, plaintiff must first set forth evidence of a *prima facie* case of

retaliation. Second:

> . . . if the plaintiff succeeds in proving the prima facie case, the burden
> shifts to the defendant 'to articulate some legitimate, [non-retaliatory]
> reason for the employee's rejection' . . . Third, should the defendant carry
> this burden, the plaintiff must then have an opportunity to prove by a
> preponderance of the evidence that the legitimate reasons offered by the
> defendant were not its true reasons, but were a pretext for [retaliation] . . .
> The ultimate burden of persuading the trier of fact that the defendant
> intentionally [retaliated] against the plaintiff remains at all times with the
> plaintiff.

Balach v. Norton, ___ F. Supp. 2d ___2007 WL 2774507 *5 (D.D.C. 2007) (*citing*

Burdine, 450 U.S. 248, 252-53 (1981) (internal citations omitted) (*quoting* McDonnell

Douglas v. Green, supra).

To establish a prima facie case of retaliation, "the plaintiff must present evidence

that (1) he engaged in protected activity; (2) the employer took a material adverse action

against him; and (3) the adverse action was causally related to the exercise of his rights."

Moses v. Howard University Hosp., 2007 WL 442218, *5 (D.D.C. 2007) (*citing*

Holcomb v. Powell, 433 F.3d 889, 901-02 (D.C.Cir. 2006); Hussain v. Nicholson, 435

F.3d 359, 366 (D.C.Cir. 2006).  Under these directives, a plaintiff must demonstrate that

the employer's challenged action would dissuade a "*reasonable* employee" from going to

the agency's EEO office, either to lodge a complaint or seek help in resolving allegation

of discriminatory or retaliatory treatment.  See Burlington Northern & Santa Fe Ry. v.

White, 126 S. Ct. 2405, 2411-12, 2415 (2006). Title VII does not seek to set a mere

"civility code for the American workplace," Id. at 2415.  Rather, proof of injury is

required.

Once an employee satisfies the three elements of a *prima facie* case, it "raises a

'rebuttable presumption of unlawful discrimination,'" shifting the burden to the

defendant to rebut such presumption. Id.  (*citing* Smith v. District of Columbia, 430 F.3d

450, 455 (D.C.Cir.2005) and Jones v. Wash. Metro. Area Transit Auth., 205 F.3d 428,

433 (D.C.Cir.2000)).

With regard to the first prong of the *prima facie* case, the alleged activity must be

statutorily protected activity. Forkkio v. Powell, 306 F.3d 1127, 1131-32 (D.C. Cir.

2002). As to the second prong, it seeks to prohibit employer actions that cause harm, *i.e.,*

that are likely "to deter victims of discrimination from complaining; . . . And normally

petty slights, minor annoyances, and simple lack of good manners will not create such

deterrence.' Burlington, 126 S.Ct. at 2415.  "[T]he significance of any given act of

retaliation will often depend upon the particular circumstances.  Context matters." Id.

With regard to the third prong, the plaintiff may establish a causal connection "by

showing that the employer had knowledge of the employee's protected activity, and that

the [retaliatory] personnel action took place shortly after that activity." Cones v. Shalala,

199 F.3d 512, 521 (D.C. Cir. 2000) (*quoting* Mitchell v. Baldridge, 759 F.2d 80, 86 (D.C.

Cir. 1985). However, the temporal activity must be very close. <u>Clark County Sch. Dist. V. Breeden</u>, 532 U.S. 268, 273 (2001) (three or four-month period is insufficient to show causal connection, and 20-month period suggests "no causality at all").

If plaintiff is able to establish a prima facie case of retaliation, the analysis then follows that for a discrimination claim, defendant must articulate legitimate non-discriminatory reasons for its actions and plaintiff then has the burden of proving that defendant's actions were taken for reasons other than those offered, but instead, for a retaliatory purpose. <u>Moses v. Howard University Hosp</u>., 474 F.Supp. 2d 117 (D.D.C. 2007).

### D. <u>Standard for a Hostile Work Environment Claim</u>

A workplace environment becomes hostile for the purposes of Title VII "only when offensive conduct 'permeate[s] [the workplace] with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" <u>Barbour v. Browner</u>, 181 F.3d 1342, 1347-1348 (D.C. Cir. 1999) (*quoting* <u>Oncale v. Sundowner Offshore Servs., Inc.</u>, 523 U.S. 75, 78 (1998)). "[N]ot all abusive behavior, even when it is motivated by discriminatory animus, is actionable." <u>Barbour</u>, 181 F.3d at 1347. Rather, the conduct must be severe and pervasive enough to create an objectively hostile or abusive environment.

To determine whether a reasonable person would find the environment hostile or abusive, the Supreme Court outlined a totality of the circumstances test in <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17 (1993). The <u>Harris</u> Court stated that whether the environment is "hostile" or "abusive" can only be determined by looking at all the circumstances, including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or

humiliating, and whether it unreasonably interferes with an employee's work performance. Id. at 23. Plaintiff must meet this standard in order to establish a hostile work environment claim because, as the Supreme Court noted, Title VII does not provide a cause of action for "ordinary tribulations" of the workplace. Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) (citations omitted).

Plaintiff must show that (1) he was a member of a protected class or participated in EEO protected activities; (2) he was subjected to harassment; (3) the harassment complained of was based upon his race, national origin, sex, or (other protected category); (4) the charged race or (other protected category) harassment had the effect of unreasonably interfering with the plaintiff's work performance and creating an intimidating, hostile, or offensive working environment; and (5) the existence of respondeat superior liability. See e.g. Davis v. Coastal International Security, Inc., 275 F.3d 1119, 1122-23 (D.C. Cir. 2002) (citing Yeary v. Goodwill Industries-Knoxville, Inc., 107 F.3d 443, 445 (6th Cir. 1997)).

Our Circuit's pronouncements in Stewart v. Evans, 275 F.3d 1126, supra, a sexual harassment case, confirm that, to be actionable, the alleged conduct must be both overtly directed towards plaintiff's membership in the protected class, and severe:

> Title VII does not prohibit all forms of workplace harassment, only those directed at discrimination because of sex. See Oncale v. Sundowner Offshore Serv., Inc., 523 U.S. 75, 80, 118 S. Ct. 998, 1002, 140 L.Ed. 2d 201 (1998). Furthermore, workplace harassment does not violate Title VII merely because the "words used have sexual content or connotation," but only if members of one sex are disadvantaged in the terms or conditions of their employment because of the harassment. Id. Title VII is not a "general civility code for the American workplace," id. at 80, 118 S. Ct. at 1002 nor does it serve as a remedy for all instances of verbal or physical harassment, for it does not "purge the workplace of vulgarity." Baskerville v. Culligan Int'l Co., 50 F.3d 428, 430 (7th Cir. 1995).

Stewart, 275 F.3d at 1133. Thus, when there is no evidence that the alleged conduct is

discriminatory, that is, based upon the employee's membership in a protected class, that conduct simply is not relevant to a hostile work environment claim.  See id.; see also Harris, 510 U.S. at 21; Gonzalez v. Western Resources, Inc., 36 F. Supp. 2d 1289, 1295 (D. Kan. 1999) ("Only those actions which are based on the plaintiff's national origin can be used to support this [hostile work environment] claim."); Crawford v. Medina General Hospital, 96 F.3d 830, 836 (6th Cir. 1996) (affirming summary judgment: "Unquestionably, there was hostility and abusiveness in this working environment, but the evidence suggests that the atmosphere stemmed from a simple clash of personalities.  In any event, there is an absence of evidence that it stemmed from a dislike of people over a particular age.").

### E.  Plaintiff's Complaint Should be Dismissed or Summary Judgment Entered.

In this section, defendant sets forth as succinctly as possible the reasons that plaintiff's claims should be dismissed or summary judgment entered in defendant's favor.

### 1.  Plaintiff Cannot Establish a *Prima Facie* Case of Retaliation.

Plaintiff attempts to create a causal connection with prior EEO activity in 1996-1998 and 1999-2000.  Those events happened four years before the events he claims are retaliatory in this case.  Attachment 2 at p. 2 (Informal Complaint); Attachment 4 at 1 (Answer #5). Accordingly, under the dictates of Clark County Sch. Dist. v. Breeden, supra, the temporal connection is simply not there.  Indeed, there is "no causality at all."  Id.; see also Mayers v. Laborers' Health & Safety Fund, 478 F.3d 364, 370 (D.C. Cir. Mar. 2, 2007) (eight or nine-month gap insufficient).

Even if there was a causal connection, there was no material adverse personnel action and, indeed, the individual who conducted the investigation and presumably responsible for plaintiff's injuries, to the extent that he had any, was Glen Alonso who has not been named as

an alleged discriminating official in this action.  See Ginger v. District of Columbia, et al., 477

F.Supp.2d 40, 53 (D.D.D. 2007) (initiation of investigation that does not result in discipline not

adverse).   Even if he was named, there is no evidence that he knew of plaintiff's EEO

activities in 1996-1998 and 1999-2000.

     Of additional note, the actions taken by Mr. Alonso and those of Ms. Jackson and Mr.

Brent, were based on legitimate nondiscriminatory reasons related to the security of the

building and its employees.  It would have been irresponsible for them to have ignored the

discrepancies in the reasons given for plaintiff's travel and the agency's policies on reporting

and investigating extended foreign travel.  Indeed, the very fact that there was contradictory

evidence concerning the reasons for plaintiff's return trip, and the fact that plaintiff's mother

was deceased when he went back to Afghanistan to tend to his mother's illness, was enough to

raise both eyebrows of the Security staff. See Attachment 8 at p. 16, line 18; p. 17, lines 1-12;

see also Id., p. 48, lines 18-21; p. 49, lines 1-9.

## 2.  **Plaintiff Cannot Establish a Claim of Hostile Work Environment.**

     In this case, there is no evidence that the any alleged "hostile" conduct in connection

with plaintiff's extended travel to Afghanistan was based on his race and/or color, national

origin, sex or in retaliation for prior protected activity.  Plaintiff merely speculates that because

he was a native of Afghanistan that he was subjected to hostile treatment based on his race

and/or color and national origin, because of the "odd" questions he was asked by Mr. Alonso.

Attachment 11 at p. 130, lines 12-22, p. 131-132.   At his deposition, plaintiff expressed his

opinion that because he came from Afghanistan and traveled to Afghanistan and because

"terrorists" come from that area, he was treated as a terrorist.  Id. at p. 133, lines 1-6.  His

conclusion was that "[b]ecause I am coming from Afghanistan and that's why they did it." See

Id. at p. 133, lines 7-17.   Defendant observes that being a "terrorist" is not a protected class.

Nothing offered by plaintiff shows that it was his national origin, race, or any other protected category, was the reason for the investigation.  Indeed, Mr. Alonso made it clear that his actions were generated strictly by safety concerns for the BEP after discovering that plaintiff had given contradictory reasons for his extended travel to a country with which the U.S. has been in armed conflict.  Attachment 8 (Alonso Deposition) at pp. 49, lines 1-9. Moreover, he had discovered that plaintiff previously visited countries that "came in different intelligence reports for gathering places for terrorists groups." Id.; see also pp. 12-18, pp. 24-29.  He struggled with the idea that plaintiff could be a terrorist because he knew him and thought he was a "good judge of his character." Id. at 49, lines 1-9.  Nothing in Mr. Alonso's testimony suggests that his actions were taken for unlawful reasons.

Plaintiff argues that he was asked "odd" questions at his interview, and because he was an Afghani traveling  to Afghanistan, that he was the victim of discrimination/retaliation/ hostile work environment.  These bare accusation are insufficient to establish his claims in this case.  See Stewart, 275 F.3d at 1133. Furthermore, nothing that plaintiff has alleged is the type of harassment required by the law, i.e., conduct that permeates the workplace with "discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. at 78.  Within a three-week period, the circumstances of plaintiff's extended travel were investigated and resolved.  During the period he was on approved leave.  There is no showing that the alleged harassers even saw him during the three-week period (between the first week in November 2004 when he returned to BEP to go to the credit union and November 29, 2004, when he returned to the workplace).

Accordingly, there could be no hostile work environment created during that period.

Plaintiff makes reference to two isolated incidents as evidence of a hostile work environment:  when a co-worker referred to him as  "Chemical Ali," and; when Ms. Jackson remarked that he may not have fathered his unborn child.  As to the first event, it is unclear when this exchange occurred, but, what is clear is that the remark was an isolated event and plaintiff knew his co-workers were teasing.  See Attachment 11 (Asghar Deposition), p. 146, lines 1-21; p. 180, lines 10–22; 181, lines 1-22.  With regard to the second, Ms. Jackson's remark was made on or about January 5, 2005, and had no connection, whatsoever, to plaintiff's race/color, national origin, sex or any other protected activity. Attachment 10 (Jackson Deposition), p. 72, lines 11-21; p. 73, line 1.  After she said it, Ms. Jackson recognized she had unintentionally insulted plaintiff and apologized. Id. at p. 73, lines 11-21, p. 74, & p. 75, line 1-10.  Her remark may have been in bad taste, but it does not provide the vehicle for the type of pervasively hostile treatment that sustains a hostile work environment claim.

Accordingly, plaintiff has not carried his burden of establishing a hostile work environment.

### 3.  Plaintiff Cannot Establish a *Prima Facie* Case of Discrimination.

Plaintiff has alleged that he was subjected to discrimination based on his national origin, race and/or color in November 2004 when he returned from a second extended trip to Afghanistan and was interviewed by a Bureau security official; when an FBI agent visited his home to interview him regarding his travels to Afghanistan; when he was called "Chemical Ali" and when his Jackson made a derogatory comment about whether he was the father of his unborn child.

First, he suffered no adverse personnel action. At most, he was the subject of a brief (3-week) investigation during the period he was on leave. Although he was embarrassed, the circumstances surrounding his extended travel and the fact that he gave different reasons for the travel, clearly warrant the actions taken by the agency. They would be what any prudent Government security office would do in the wake of the 9/11 disaster and the conflicts in Afghanistan.

Even if plaintiff establishes that he suffered an adverse personnel action, there were legitimate, nondiscriminatory/nonretaliatory reasons for the actions taken. Ms. Jackson and Mr. Brent properly notified the Office of Security of plaintiff's extended travel and the discrepancies in the reasons for the travel. Mr. Alonso properly investigated the matter after learning that plaintiff's mother, who his supervisor believed he was visiting, had died long before the trip. To the extent that he argues that he was "really" talking about his "stepmother," that does not lessen the confusion that was created before this fact was known and when he was, indeed, out of the country. He also admitted that he did not list his stepmother as a family member on his security forms. Attachment 11 (Asghar Deposition), p. 123.

Plaintiff cannot create a factual issue of pretext merely on personal speculation of discriminatory intent. See Greene v. Dalton, 164 F.3d 671 (D.C. Cir. 1993); Phillips v. Holladay Property Services, Inc., 937 F.Supp. 32, 35, n. 2 (D.D.C. 1996), aff'd. 1997 WL 411695 (D.C. Cir. 1997) ("[A] plaintiff's denial of defendant's articulated reason without producing substantiation for the denial is insufficient to withstand a motion for summary judgment"). Here, plaintiff's claims of discrimination and retaliation are based solely on his unsubstantiated assumptions and conjecture, rather than on concrete facts. Thus, plaintiff has

failed to offer more than mere speculation that he has been discriminated against based on his race, color and/or in retaliation for participation in prior protected activity.  In contrast, defendant has proffered legitimate, nondiscriminatory reasons for its actions and has sufficiently supported its actions with probative facts and evidence.

## CONCLUSION

Based on the foregoing reasons, defendant respectfully requests that plaintiff's complaint be dismissed for failure to state a claim, or in the alternative, that defendant's Motion for Summary Judgment is granted.

Respectfully submitted,

_____/s/_____
JEFFREY A. TAYLOR , D.C. Bar # 498610
United States Attorney

_____/s/_____
RUDOLPH CONTRERAS, D.C. Bar # 434122
Assistant United States Attorney

_____/s/_____
CLAIRE WHITAKER, D.C. Bar # 354530
Assistant United States Attorney
United States Attorneys Office
Civil Division
555 4th Street, N.W., Room E-4204
Washington, D.C. 20530
(202) 514-7137

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                                    )
**ALI ASGHAR,**                                     )
                                                    )
            **Plaintiff,**                          )
                                                    )
**v.**                                              )
                                                    )        **Civil Action No. 06-0400 (RJL)**
**HENRY M. PAULSON, Jr., Secretary,**               )
**Department of Treasury,**                         )
                                                    )
            **Defendant.**                          )
_____)

<u>DEFENDANTS'S STATEMENT OF MATERIAL FACTS NOT IN DISPUTE</u>

1.  Plaintiff engaged in EEO matters with the Department of Treasury's Bureau of Engraving ("BEP") between 1996-1998 and 1999-2000 which were resolved prior to January 2001. R. 1. at ¶ 8; <u>see also</u> Attachment 2 at p. 2 and Attachment 4 at p. 1 (Answer #5).

2.  The underlying claims in this lawsuit involve events in November 2004, and a singular incident on January 4, 2005. Attachment 1 at 1-3 .

3.  Plaintiff visited Afghanistan twice during several months in 2004. Request for Admissions at No. 1 (Attachment 5). The trip at issue here was taken between July 15, 2004 to November 2004. Attachment 4 (Affidavit of Ali Asghar) at p. 3.

4.  For the second trip, plaintiff requested and was granted leave through December 31, 2004. Attachment 6 (leave slip).

5.  His leave slip explained that he needed to return to Afghanistan for some family matters. It was approved by Antoine Johnson, one of his supervisors. <u>Id</u>.; Attachment 10 (Deposition of Felicia Jackson), p. 27, lines 3-11.

6.  Plaintiff "told [Felicia Jackson] that [his] mother was ill . . ." Attachment 4 (Asghar

Affidavit) at p. 5.

7.  In August 2004, Ms. Jackson alerted her second line supervisor, Mr. James Brent, of plaintiff's extended travel to Afghanistan when she discovered that plaintiff had told Mr. Johnson a different reason than he told her.  Attachment 10 (Jackson Deposition) at p. 27, lines 3-11; p. 35, lines 2-18; p. 36, lines 7-17; p. 43, lines 5-18.

8.  Mr. Brent notified the Office of Security about plaintiff's foreign travel pursuant to BEP policy.  Attachment 7 (Deposition of James Brent), p. 22, lines 6-21; p. 23, lines 1-15; <u>see also</u> Attachment 8 (Deposition of Glen Alonso), p. 57 at lines 13-21 and p. 58, lines 1-6.

9.  At the Office of Security's request, Mr. Brent queried either Ms. Jackson or Mr. Johnson about the reasons for plaintiff's travel, learned it was taken because of a "sick" parent, and conveyed that information to the Security Office.   Attachment 7 (Brent Deposition) at p. 24, lines 1-21; p. 25, lines 1-4.

10.  Mr. Glen Alonso of the Security staff followed-up with Mr. Brent and learned that plaintiff had traveled to Afghanistan to attend to his sick mother, who was "critically ill, suffering from cancer, and was not expected to live. . ." <u>Id.</u> at p. 12, lines 7-20; p. 15, lines 1-20.

11.  Mr. Alonso reviewed plaintiff's security folder and discovered that plaintiff's mother was deceased. <u>Id</u>. at 16, lines 3-18.

12.  Because plaintiff had previously reported his mother as deceased and told his supervisor, Felicia Jackson, that he was going to Afghanistan to care for his sick mother, Mr. Alonso became "suspicious." <u>Id</u>. at line 18.

13.   Mr. Alonso's testimony shows he was struggling with what to do in light of the conflicting representations.  <u>Id</u>. at p. 48, lines 18-21, and p. 49, lines 1-15.

14. After plaintiff returned from Afghanistan, on or about November 8, 2004, he was unable to gain access to the BEP building by using his entry badge because it had been "redlined." Id. at 3-4; Attachment 11 (Asghar Deposition at p. 130, lines 4-10; Attachment 9 at p. 6 (describing redlining).

15. Mr. Alonso met plaintiff at the guard's desk, escorted him to the credit union, and then interviewed him. See Attachment 11 (Asghar Deposition) at p. 130, lines 12-15 and Attachment 9 (Alonso Affidavit) at p. 2.

16. During the interview, Mr. Alonso informed plaintiff that the interview was based upon his recent travels abroad, and it was intended to discern whether he had any contacts or propositions requesting favors or entry into the U.S. while he was in Afghanistan. Attachment 11(Asghar Deposition) at p. 130, lines 19-22, 131, lines 1-5.

17. Mr. Alonso's notes reflected that plaintiff did not plan to return to work until January 6, 2005, after his investigation would be completed. Attachment 9 (Alonso Affidavit) at notes; Attachment 8 (Alonso Deposition) at p. 37, lines 17-21; p. 38, lines 1-6; p. 41, lines 19-21; p. 42, lines 1-9; p. 43, lines 11-21, p. 44, lines 1-21; p. 46, lines 10-15.

18. At the conclusion of the interview, Mr. Alonso advised plaintiff that he the FBI would be contacting him regarding his recent travel to Afghanistan.

19. An FBI agent visited plaintiff's home on or about November 23, 2004, to interview him. Attachment 4 at 4; see also Attachment 9 (Alonso Affidavit) at p. 5. The FBI interview lasted about 45 minutes. R. 1 (Complaint) at ¶ 13; Attachment 11 (Asghar Deposition) at p. 150, lines 13-22 & p. 151, lines 1-2.

20. Plaintiff was cleared to return to work on November 26, 2004. Attachment 8 (Alonso Deposition) at p. 46, lines 20-21; p. 47, lines 1-3.

3

21.  Plaintiff returned to work on November 29, 2007.  Plaintiff returned to work on November 29, 2004.  R. 1 at ¶ 14.

22.  Plaintiff worked from Monday, November 29, 2004, until the Christmas shutdown (approximately three weeks). Attachment 11 (Asghar Deposition) p. 145, lines 12-19; p. 147, lines 1-22; p. 148, lines 1-8.

23.  On January 4, 2005.  Attachment 3 at 1.  Ms. Jackson made an admittedly inappropriate comment to plaintiff about the possibility that his wife's pregnancy was the result of someone other than him.  She said  "Well, Mr. Asghar, you was gone a long time. You know what they said, 'Momma's baby, Poppa's maybe.'" This comment did not involved plaintiff's national origin, race, color, sex, or protected activity.  Attachment 10 (Jackson Deposition), p. 72, lines 11-21; p. 73, line 1.

24.  Ms. Jackson apologized to plaintiff. Id. at p. 73, lines 11-21, p. 74, & p. 75, line 1-10; see also Request for Admissions at #15.

25.  He sought counseling on January 10, 2005.  Attachment 1 at p. 1.

Respectfully submitted,

_____/s/_____
JEFFREY A. TAYLOR , D.C. Bar # 498610
United States Attorney


_____/s/_____
RUDOLPH CONTRERAS, D.C. Bar # 434122
Assistant United States Attorney


_____/s/_____
CLAIRE WHITAKER, D.C. Bar # 354530
Assistant United States Attorney
United States Attorneys Office
555 4th Street, N.W., Room E-4204
Washington, D.C. 20530
(202) 514-7137
