# Attachment 7

```
 1              UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF COLUMBIA

 3    ALI ASGHAR,                    :

 4              Plaintiff,           :

 5        v.                         : Case No.

 6    JOHN SNOW, SECRETARY,          : 06-0400  (RJL)

 7    U.S. DEPARTMENT OF TREASURY,   :

 8              Defendant.           :

 9                                   : Pages 1 - 54

10

11

12

13            Deposition of JAMES BRENT, JR.

14                   Washington, D.C.

15                 Monday, July 23, 2007

16

17

18

19

20    Reported by:  George W. Tudor, RPR

21    Job No. 182205C
```

Page 2

5  July 23, 2007
6  2:30 p.m.

9  Deposition of JAMES BRENT, JR., held at the:

11  Law Offices of David A. Branch
12  1825 Connecticut Avenue, N.W.
13  Suite 690
14  Washington, D.C. 20009

16  Pursuant to notice, before George W. Tudor, RPR, a
17  Notary Public of the District of Columbia.

Page 4

1  I N D E X
2  EXAMINATION OF JAMES BRENT, JR.
3  BY:                                    PAGE:
4  MR. BRANCH:                             5

7  EXHIBITS   DESCRIPTION                  PAGE
8  No exhibits were marked.

Page 3

1  ON BEHALF OF THE PLAINTIFF:
2      DAVID A. BRANCH, ESQUIRE
3      1825 Connecticut Avenue, N.W.
4      Suite 690
5      Washington, D.C. 20009
6      202.785.2805

8  ON BEHALF OF THE DEFENDANT:
9      CLAIRE WHITAKER, ESQUIRE
10     Assistant United States Attorney
11     United States Attorney's Office
12     Civil Division
13     555 4th Street, N.W., Room E-4202
14     Washington, D.C. 20530
15          -and-
16     GAIL SERENCO, ESQUIRE
17     Department of the Treasury
18     Bureau of Engraving and Printing
19     14th and C Streets, S.W., Room 419-A
20     Washington, D.C. 20228
21     202.874.2946

Page 5

1       Thereupon,
2              JAMES BRENT, JR.,
3   a Witness, called for oral examination by counsel
4   for the Plaintiff, having been duly sworn by the
5   Notary Public, was examined and testified as
6   follows:
7       EXAMINATION BY COUNSEL FOR THE PLAINTIFF
8   BY MR. BRANCH:
9       Q.  Please state your name.
10      A.  James Brent, Jr.
11      Q.  Good afternoon, Mr. Brent. My name is
12  David Branch. Our office represents Mr. Asghar
13  and we're here today to take your deposition.
14          Let me start by giving you some of the
15  ground rules for the deposition and then I'll
16  proceed with the questions. If you need to take a
17  break at any point during the deposition, let me
18  know and I'll accommodate that request. I would
19  ask that if there is a question pending before
20  you, that you answer the question before we take a
21  break.

2 (Pages 2 to 5)

Page 14

1   Q. Just attendee, huh?
2   A. Yep.
3   Q. When did you become acquainted with
4   Mr. Asghar?
5   A. 1996, which is when I came over to the
6   currency office. Thereabouts or sometime after
7   that.
8   Q. What was his position when you arrived?
9   A. I don't recall.
10  Q. Was he a currency checker or currency
11  processor, checker?
12  A. I don't think at that time. I don't
13  recall the exact position.
14  Q. Was there a time when Mr. Asghar was an
15  acting supervisor?
16  A. Yes.
17  Q. Did you have any involvement in the
18  decision to place him in a position of acting
19  supervisor?
20  A. I don't recall.
21  Q. Did you have any involvement in the

Page 15

1   decision to end his tenure as an acting
2   supervisor?
3   A. He's currently an acting supervisor.
4   Q. That is his official title?
5   A. No, acting supervisor is not an official
6   title.
7   Q. What is acting supervisor?
8   A. He is currently in the acting supervisor
9   program in the area that he works in, and that
10  means the individual may or may not be utilized to
11  fill a slot when the supervisor is absent or on
12  other duties. But it's not an official title.
13  Q. So the individual may or may not be
14  called upon --
15  A. Correct.
16  Q. -- to serve as an acting supervisor when
17  the supervisor is out.
18  A. Correct.
19  Q. Are they given additional compensation
20  when they serve as the acting supervisor?
21  A. Yes, they are.

Page 16

1   Q. Will you explain to me how this works?
2   A. The permanent position of record, if we
3   use Mr. Asghar's case, is a currency shipment
4   processor. It's a wage grade position. You can
5   compete for -- an employee can compete and be
6   selected to go into an acting pool of candidates
7   for the particular area. We normally have
8   actings, because from time to time there is
9   absenteeism with the supervisors; one or both may
10  be out, and we have backups available to use if
11  necessary. So you're part of a pool of candidates
12  that can be called upon or may be called upon to
13  fill in.
14  Q. And who would make the decision whether
15  someone is called upon to serve as an acting
16  supervisor?
17  A. The immediate supervisor in the area.
18  Q. Were you involved in an investigation of
19  Mr. Asghar in 2004?
20  A. Not an investigation.
21  Q. What were you involved in?

Page 17

1   A. Can you be more specific?
2   Q. Well, in 2004, was there an
3   investigation conducted on the activities of
4   Mr. Asghar?
5   A. Activities?
6   Q. Yes, travel activities to Afghanistan or
7   terrorist activities or any of that?
8   A. Not part of an investigation. What I
9   did do and what my responsibility was, when I
10  found out information about the travel, it was
11  just reported to our security office, and it was
12  reported just as information.
13  Q. What information did you learn about
14  Mr. Asghar?
15  A. That he had requested through his
16  immediate supervisor an extended leave of absence
17  for foreign travel reasons.
18  Q. How did you learn this information?
19  A. From the immediate supervisor.
20  Q. Who was the immediate supervisor?
21  A. Again, there's two, Antoine Johnson and

Page 18

1    Felicia Jackson. I believe in this case it was
2    Felicia Jackson.
3        Q. What did Ms. Jackson tell you?
4        A. Just that an employee requested a leave
5    of absence for an extended period of time. One
6    was just a notification of the absence and the
7    second thing was, how do we cover the absence of
8    the employee if it's approved. That's the
9    staffing issue that it left behind.
10       Q. And when did you learn this?
11       A. I don't remember the exact date. It was
12   in 2004; I don't remember the exact month and
13   date.
14       Q. And how did you respond?
15       A. That I would contact the Office of Human
16   Resources to, you know, see how we could address
17   the staffing matter.
18       I also reported as required that we have
19   an employee that's requested and likely will be
20   approved for an extended leave of absence for
21   foreign travel.

Page 19

1        Q. Did she tell you who the employee was?
2        A. She did.
3        Q. And what did she tell you, just more --
4    if you recall more specifically what she told you
5    about any of the details.
6        A. Just that Mr. Asghar had requested --
7    and I don't recall the exact time period, but it
8    was an extended time period -- leave of absence
9    outside of the bureau to travel to Afghanistan.
10   And that was reported to myself and Mr. Bernhart,
11   who was the second-level supervisor.
12       Q. Did Ms. Jackson tell you that
13   Mr. Asghar could be a terrorist?
14       A. I don't recall that happening, no.
15       Q. Did Ms. Jackson tell you at any point
16   that Mr. Asghar could bring a bomb into the
17   building?
18       A. I don't recall that.
19       Q. When you say you don't recall, does that
20   mean you just don't have any recollection of it,
21   or it may or may not have happened?

Page 20

1        A. I don't recall her saying that.
2        Q. Okay. So do you recall anything else
3    from this conversation with Ms. Jackson where she
4    told you that Mr. Asghar requested leave to travel
5    to Afghanistan?
6        A. No. Again, just how we cover the
7    staffing, the vacancy that, you know, for the time
8    that he was going to be out, and just reporting
9    it.
10       Q. And you said after you received this
11   information, you contacted human resources?
12       A. Yes.
13       Q. And what information did you convey to
14   human resources?
15       A. Actually, it was just what actions are
16   required. When someone is gone for an extended
17   period of time, normally there is paperwork just
18   to cover the absence. If they're going to be on
19   leave without pay -- and we normally also try to
20   get information as to how that period of time that
21   they're gone may affect within-grade increases,

Page 21

1    things like that, so we could communicate it to
2    the employee. So it was more of an administrative
3    type, just getting the knowledge of how it's
4    processed.
5        Q. Did you convey this information to
6    anyone else?
7        A. Yes.
8        Q. Who else?
9        A. Just to the manager, who, again, is Bob
10   Bernhart, just to let them know how it would be
11   handled with respect to the staffing or whether we
12   would backfill a position or move an employee from
13   another area or we could make due with the absence
14   and just cover it with the regular crew.
15       Q. And what was his response?
16       A. He conveyed the information to the
17   immediate supervisors.
18       Q. Was a decision made on whether you would
19   backfill the position or any of these other things
20   that you just mentioned?
21       A. Yes.

Page 22

1  Q. Was what the decision?
2  A. We did not backfill the position. We
3  could make do with the regular staff and just have
4  people double up a little bit until Mr. Asghar
5  returned.
6  Q. Other than HR and Mr. Bernhart, did you
7  discuss Mr. Asghar's absence with anyone else?
8  A. Just the office of security, and just
9  reporting that the employee would be gone and
10 there was foreign travel involved. And that was,
11 again, just for information purposes and
12 requirement.
13 Q. When did you convey this information to
14 the Office of Security?
15 A. I believe it was in August.
16 Q. August of '04?
17 A. Yes.
18 Q. Who did you speak to in the Office of
19 Security?
20 A. My counterpart, or the chief of the
21 Office of Currency -- I mean of Security.

Page 23

1  Q. Was that?
2  A. Dave Lindsey at the time. And the
3  assistant chief, Glen Alonso.
4  Q. Did you actually speak to these folks or
5  just sent them e-mail?
6  A. I sent them correspondence.
7  Q. What information did you send in this
8  correspondence?
9  A. Pretty generic. I think it was to the
10 effect of -- you know, "The following is just for
11 informational purposes only. We have an employee
12 in the Federal Reserve vault --" which is the area
13 that Mr. Asghar worked in "-- who will be on
14 extended foreign travel to Afghanistan." And I
15 think that was the extent of it.
16 Q. Was there any type of response?
17 A. If we knew what the reason was for the
18 travel.
19 Q. Who requested that information?
20 A. I believe that was Mr. Alonso.
21 Q. And did you respond to that?

Page 24

1  A. I don't recall whether I responded, but
2  I certainly did ask the division manager to check
3  with the -- or either he did or I did -- check
4  with the immediate supervisors to see if we could
5  ascertain the reason for the travel, at security's
6  request.
7  Q. And what else happened?
8  A. The information that we got back was
9  that Mr. Asghar had a sick parent that he was
10 going to visit.
11 Q. Who provided that information to you?
12 A. Either Mr. Johnson or Ms. Jackson.
13 Q. Did Ms. Jackson tell you that Mr.
14 Asghar said he had to conduct family business in
15 Afghanistan?
16 A. That there was a sick parent, was the
17 information that I got back.
18 Q. Beyond there being a sick parent, did
19 she tell you that he informed her that he had to
20 conduct family business?
21 A. I don't recall. I would consider that

Page 25

1  family business if that --
2  Q. What happened next?
3  A. I just responded back to the Office of
4  Security that -- with that information.
5  Q. Was there any response from the Office
6  of Security?
7  A. I don't recall. I don't believe there
8  was at that point.
9  Q. When was the next contact that you had
10 with anyone concerning issues related to Mr.
11 Asghar?
12 A. I don't recall.
13 Q. Were you instructed at some point that
14 Mr. Asghar should be redlined?
15 A. Yes.
16 Q. When did you get those instructions?
17 A. I don't remember the exact month that
18 they came.
19 Q. So after this --
20 A. But it was after August, 2004.
21 Q. After August, 2004, what was the next

Page 38

1  Q. Did he question you as to why he was
2  singled out for this treatment?
3  A. I don't recall.
4  Q. Do you recall anything else that
5  Mr. Asghar said or any other complaint that he
6  made at that time?
7  A. I don't. Just about the investigation
8  and that -- how it went about.
9  Q. Did you have any involvement in causing
10 the FBI to investigate Mr. Asghar?
11 A. None whatsoever.
12 Q. Was there any effort to give Mr. Asghar
13 any type of back pay for the time he was redlined
14 and not able to come to work?
15 A. Not to my knowledge.
16 Q. Was there any effort to change his leave
17 without pay to some type of leave that he would
18 receive compensation for?
19 A. Administrative leave or something?
20 Q. Yes.
21 A. I don't recall.

Page 39

1  Q. You do have administrative leave
2  available to you?
3  A. Correct.
4  Q. And he would have been placed on
5  administrative leave while this investigation was
6  going on?
7  A. Correct.
8  Q. Was there any discussion of placing him
9  on administrative leave for that period of time?
10 A. Not that I recall.
11 Q. Has Mr. Asghar complained to you on any
12 occasion about being harassed by coworkers?
13 A. Yes, he has, on occasion.
14 Q. What type of complaints has he made to
15 you about being harassed?
16 A. Just some of the -- you know, I guess
17 bantering back and forth between employees and
18 himself.
19 Q. Did he tell you that the employees
20 called him Chemical Ali?
21 A. He may have mentioned that to me. I

Page 40

1  don't recall specific names that may have --
2  Q. What action, if any, did you take as a
3  result of any complaints made by Mr. Asghar?
4  A. There was some sensitivity training that
5  was offered to a number of individuals. There was
6  also -- I had asked that the division manager and
7  immediate supervisors hold a meeting to keep
8  things strictly professional, strictly business.
9  Q. Is this an environment where there is a
10 lot of joking and horseplay?
11 A. You know, to be honest, because I'm a
12 little removed from the area, I'm not completely
13 aware. I don't think that it is an environment
14 where that happens frequently. But Mr. Asghar did
15 complain about, you know, being harassed at times.
16 Q. And were his complaints specifically
17 that people were making either derogatory comments
18 about his national origin or religion?
19 A. Yeah, it was more just a bantering back
20 and forth between employees.
21 Q. Which employees participated in this

Page 41

1  sensitivity training?
2  A. Supervisors, including Ms. Jackson, and
3  I don't recall the employees that participated.
4  Q. Did you learn at some point that
5  Ms. Jackson made a comment to Mr. Asghar that he
6  may not be the father of his baby?
7  A. I did.
8  Q. And how did you learn that?
9  A. I believe it was one evening when I was
10 completing my affidavit, or Mr. Asghar brought
11 that to my attention.
12 Q. Did you speak to Ms. Jackson about that?
13 A. Yes.
14 Q. Did you offer her any type of counseling
15 or discipline as a result of it?
16 A. Yes.
17 Q. Which?
18 A. Yes to both.
19 Q. So you issued her counseling and
20 discipline?
21 A. Counseling and training.

11 (Pages 38 to 41)