Attachment 8

Glen E. Alonso

Page 1

1                UNITED STATES DISTRICT COURT

2                FOR THE DISTRICT OF COLUMBIA

3    ALI ASGHAR,                        :

4              Plaintiff,               :

5         v.                            : Case No.

6    JOHN SNOW, SECRETARY,              : 06-0400 (RJL)

7    U.S. DEPARTMENT OF TREASURY,       :

8              Defendant.               :

9                                       : Pages 1 - 66

10

11

12

13              Deposition of GLEN E. ALONSO

14                   Washington, D.C.

15                 Monday, July 23, 2007

16

17

18

19

20    Reported by:  George W. Tudor, RPR

21    Job No. 182205B

Attachment 8

Glen E. Alonso

Page 2

1
2
3
4
5                    July 23, 2007
6                    1:00 p.m.
7
8
9    Deposition of GLEN E. ALONSO, held at the:
10
11       Law Offices of David A. Branch
12       1825 Connecticut Avenue, N.W.
13       Suite 690
14       Washington, D.C. 20009
15
16   Pursuant to notice, before George W. Tudor, RPR, a
17   Notary Public of the District of Columbia.
18
19
20
21

Page 4

1                    I N D E X
2    EXAMINATION OF GLEN E. ALONSO
3    BY:                        PAGE:
4    MR. BRANCH:                    5
5    MS. WHITAKER:                  53
6
7    EXHIBITS   DESCRIPTION         PAGE
8    No exhibits were marked.
9
10
11
12
13
14
15
16
17
18
19
20
21

Page 3

1    ON BEHALF OF THE PLAINTIFF:
2        DAVID A. BRANCH, ESQUIRE
3        1825 Connecticut Avenue, N.W.
4        Suite 690
5        Washington, D.C. 20009
6        202.785.2805
7
8    ON BEHALF OF THE DEFENDANT:
9        CLAIRE WHITAKER, ESQUIRE
10       Assistant United States Attorney
11       United States Attorney's Office
12       Civil Division
13       555 4th Street, N.W., Room E-4202
14       Washington, D.C. 20530
15             -and-
16       GAIL SERENCO, ESQUIRE
17       Department of the Treasury
18       Bureau of Engraving and Printing
19       14th and C Streets, S.W., Room 419-A
20       Washington, D.C. 20228
21       202.874.2946

Page 5

1        Thereupon,
2                    GLEN E. ALONSO,
3    a Witness, called for oral examination by counsel
4    for the Plaintiff, having been duly sworn by the
5    Notary Public, was examined and testified as
6    follows:
7        EXAMINATION BY COUNSEL FOR THE PLAINTIFF
8    BY MR. BRANCH:
9        Q.  Please state your name.
10       A.  Glen Ernest Alonso, Sr.
11       Q.  And if you will spell your first and
12   last names, sir.
13       A.  It's Glen, G-L-E-N; Alonso, A-L-O-N-S-O.
14       Q.  Good afternoon, Mr. Alonso.  My name is
15   David Branch.  We're here to take your deposition.
16   I want to give you some the ground rules for the
17   deposition before I start with the questions.
18       First, are you taking any medication or
19   receiving any type of treatment which would impair
20   your ability to both understand and answer the
21   questions?

2 (Pages 2 to 5)

Glen E. Alonso

Page 10

1    Q.  Do you hold any undergraduate degrees?
2    A.  I do.
3    Q.  From what school?
4    A.  American University.
5    Q.  What area?
6    A.  Administration of Justice.
7    Q.  What year did you get that?
8    A.  1977.
9    Q.  Do you hold any other degrees?
10   A.  No.
11   Q.  What type work did you do before coming
12   to the bureau?
13   A.  I was -- going back how far?
14   Q.  Well, just immediately before you came
15   to the bureau.
16   A.  Immediately before the bureau, I was
17   with the Department of Defense, U.S. Naval Systems
18   Command.
19   Q.  How long were you in the military?
20   A.  Three years.
21   Q.  What's your grade in your current

Page 11

1    position.
2    A.  GS-14.
3    Q.  And in 2004 and 2005, what was your
4    grade?
5    A.  GS-14.
6    Q.  Do you know Mr. Asghar?
7    A.  I do.
8    Q.  How is it that you know Mr. Asghar?
9    A.  I met Mr. Asghar by working at the
10   Bureau of Engraving and Printing.
11   Q.  Were you called upon at any point to
12   conduct an investigation of Mr. Asghar?
13   A.  Yes.
14   Q.  On how many occasions?
15   A.  One.
16   Q.  How did you come to be involved in an
17   investigation of Mr. Asghar?
18   A.  At the request of my chief.
19   Q.  Who was the chief at the time?
20   A.  David Lindsey.
21   Q.  And what request was made of you by

Page 12

1    Mr. Lindsey?
2    A.  To contact Mr. James Brent with regards
3    to Mr. Asghar's travel out of country.
4    Q.  When did this occur?
5    A.  This would have been the early part of
6    August, 2004.
7    Q.  Did Mr. Lindsey tell you why he needed
8    you to contact Mr. Brent?
9    A.  Just based on the fact that Mr. Asghar
10   had gone out of country for an extended period of
11   time, and that the country was Afghanistan.
12   Q.  What were your job duties in the
13   position of Special Assistant to the Chief?
14   A.  I handled Special Investigations Branch.
15   Q.  When you say you handled it, what does
16   that mean?
17   A.  In other words, I supervised several
18   people and I did conduct investigations, special
19   investigations that were given to me by the chief,
20   the director or other office managers.
21   Q.  So you conducted special investigations

Page 13

1    personally?
2    A.  Yes.
3    Q.  And you were -- I'm sorry, what branch
4    were you responsible for?
5    A.  Special Investigations Section.
6    Q.  Did you supervise employees?
7    A.  Yes.
8    Q.  Your supervisor, Mr. Lindsey, asked you
9    to contact Mr. Brent because Mr. Asghar had been
10   on leave for an extended period of time and he had
11   gone to Afghanistan?
12   A.  Correct.
13   Q.  Is there any other reason why he told
14   you to contact Mr. Brent?
15   A.  As far as I can recall, no.
16   Q.  Was it the practice in your office to
17   investigate individuals who were out of the office
18   on extended leaves?
19   A.  Yes, it would be.
20   Q.  Was it done in all the cases whenever
21   someone was out of the office on an extended

4 (Pages 10 to 13)

Glen E. Alonso

Page 14

1   leave? Were they always investigated?
2       A.   If they were out of country. They
3   weren't investigated, they were questioned.
4       Q.   The request that you received from
5   Mr. Lindsey, was it in writing or was this a
6   conversation?
7       A.   No, just conversation.
8       Q.   Do you recall anything else from this
9   conversation?
10      A.   Not really. It was a long time ago.
11      Q.   So what did you do after you were given
12  this request by Mr. Lindsey?
13      A.   I called James Brent.
14      Q.   And what I want to do now is focus on
15  everything that you did as part of this
16  questioning or investigation after you received
17  this request from Mr. Lindsey.
18      A.   Okay.
19      Q.   So I want you to start from the
20  beginning until the end. You contacted Mr. Brent.
21  What happened next?

Page 15

1       A.   I contacted Mr. Brent telephonically.
2       Q.   Okay.
3       A.   He advised me that Mr. Asghar had
4   taken -- I think it was leave without pay on a
5   previous occasion that was granted by Mr. Asghar's
6   supervisor and Mr. Brent, and that it was to go to
7   Afghanistan, and he did not or he was not aware
8   that he was supposed to let us know folks that
9   were leaving the United States, going on leave for
10  an extended period of time.
11          I explained to him that he should have
12  let us know, and at that point in time he told me
13  that Mr. Asghar was going again.
14      Q.   And what happened next?
15      A.   I asked the reason for Mr. Asghar's
16  travel, did he know, and he indicated that the
17  information he received was that Mr. Asghar's mom
18  was critically ill, suffering from cancer, and was
19  not expected to live and he needed to be there
20  with her.
21      Q.   Anything else happen in that

Page 16

1   conversation?
2       A.   Not that conversation, no.
3       Q.   What was the next thing that happened?
4       A.   The next thing I did was, I pulled
5   Mr. Asghar's security folder, which would be a
6   normal course of business.
7       Q.   And why did you pull his security
8   folder?
9       A.   To review travels that he had gone to
10  previously and to see if he had gone to -- or
11  indicated that he had gone to Afghanistan.
12      Q.   And what did you find in his security
13  folder?
14      A.   In reviewing his security folder, there
15  were several trips that Mr. Asghar had listed, but
16  I noticed under relatives that his mother and
17  father and several brothers were deceased. So
18  that, in turn, made me suspicious.
19      Q.   What did you do after that?
20      A.   I contacted Mr. Brent again.
21      Q.   Why did you contact Mr. Brent?

Page 17

1       A.   Because the reason that he gave me for
2   Mr. Asghar's leaving the country was that his
3   mother was critically ill, and I wanted to verify
4   that that's exactly the correct information, and I
5   asked Mr. Brent who he got the information from,
6   and basically he told me it was two different
7   people that were Mr. Asghar's supervisors.
8       Q.   Who were those people?
9       A.   One was Mr. Bernhart and the other one
10  was a young lady that was just here; I can't
11  remember her name.
12      Q.   Ms. Jackson?
13      A.   Yes, Felicia Jackson. He advised me
14  that he had received -- he still had e-mails from
15  them, and I told him to forward them on to me,
16  which he did.
17      Q.   What was the next thing that happened?
18      A.   At that point in time when I received
19  the e-mails, they in fact reiterated what
20  Mr. Brent had said, that Mr. Asghar needed to
21  leave based on his mom being critically ill.

ESQUIRE DEPOSITION SERVICES
DC 1-800-441-3376          MD 1-800-539-6398          VA 1-800-752-8979

Glen E. Alonso

Page 18

1    Q.  Now, did Mr. Asghar author any of these
2  e-mails or were these e-mails authored by his
3  supervisors?
4    A.  By his supervisors.
5    Q.  By others.
6    A.  Yes.
7    Q.  Okay.  So you received the e-mails, and
8  what was the next thing that happened?
9    A.  Well, Mr. Asghar was not -- wasn't
10  there.  He was out of the country, as far as I
11  knew.  They advised me that they had -- based on
12  the information that I gave them as far as me
13  reviewing the forms, the forms showing that his
14  mom had passed away and had been deceased for a
15  while, that they were going to redline Mr. Asghar
16  from the bureau.
17    Q.  Who told you this?
18    A.  Mr. Brent.
19    Q.  Okay.  All right.  What happened next?
20    A.  I agreed with Mr. Brent that he should
21  be redlined, and upon entering, that I should be

Page 19

1  able to talk to him, see if we can get some type
2  of explanation as to the confusion.
3    Q.  What's the next thing that happened?
4    A.  They -- something went wrong and he was
5  not redlined.  I received a telephone call from
6  Mr. Brent indicating that Mr. Asghar had entered
7  the bureau on -- I think it was the 27th of
8  October.  October 27th.
9    Q.  Now, what does redline mean?
10    A.  Redline means basically that an
11  individual having a Bureau of Engraving and
12  Printing credential would not be able to use that
13  to get in the building.
14    Q.  And when are employees redlined?
15    A.  Various situations.
16    Q.  Such as what?
17    A.  When one of the supervisors want to make
18  sure that an individual maybe has engaged in a
19  violent situation or threats or had come in
20  intoxicated, security during lots of times when
21  they don't feel like the proper paperwork will

Page 20

1  redline them so they have to be stopped at the
2  door, we meet them there and then they fill out
3  the proper paperwork.  There is all kinds of
4  different scenarios where this can come into play.
5    Q.  Are there guidelines for when employees
6  are redlined?
7    A.  Yes.
8    Q.  Are they written guidelines?
9    A.  I believe they are, yes.
10    Q.  Did Mr. Brent tell you on any occasion
11  that an employee had reported to him that
12  Mr. Asghar may be a terrorist?
13    A.  Not in those words, no.
14    Q.  What did he tell you?
15    A.  That the employees had concern.
16    Q.  Mr. Brent told you that the employees
17  had concern?
18    A.  Correct.
19    Q.  The employees had concern about what?
20    A.  About Mr. Asghar.
21    Q.  All right.  Why don't you tell me what

Page 21

1  Mr. Brent said.
2    A.  I just did.
3    Q.  That the employees had concern about
4  Mr. Asghar's --
5    A.  Correct.
6    Q.  Was that it?
7    A.  That they felt uncomfortable.
8    Q.  So what I need you to do is tell me the
9  complete statement that Mr. Brent made to you as
10  you recall.
11    A.  That's basically what I recall.
12    Q.  Let's hear it in one or two sentences,
13  then.
14    A.  I could not relate to you the exact
15  wordage.  This happened back in 2004.  It would be
16  impossible for me to --
17    Q.  I'm not going to hold you to the exact
18  words, but generally, what did Mr. Brent tell you
19  about employees being concerned about Mr. Asghar?
20    A.  Because of his travels to Afghanistan?
21    Q.  Okay.  What I need you to do is, I want

6 (Pages 18 to 21)

Glen E. Alonso

Page 22

1  to hear it in your words, what Mr. Brent told you.
2      A.  Mr. Brent said that the employees were
3  concerned with Mr. Asghar's travels to
4  Afghanistan.
5      Q.  Do you recall anything else that
6  Mr. Brent told you?
7      A.  No, I do not.
8      Q.  What was it about Mr. Asghar's travel to
9  Afghanistan that concerned employees?
10      A.  I'm sure it was the fact that we were in
11  a war with Afghanistan at the time. I mean, there
12  was conflict going on over there.
13      Q.  Did Mr. Brent tell you that?
14      A.  No, this is what I'm telling you. You
15  asked me and I just --
16      Q.  So that's your assumption?
17      A.  Yes.
18      Q.  What I'm trying to figure out is what
19  Mr. Brent told you, if there was anything else.
20  What was the concern about Mr. Asghar and his
21  travel to Afghanistan?

Page 23

1      A.  I really didn't go into that portion of
2  it. I assumed, on my part, my assumption was that
3  based on the fact that we were in conflict with
4  that country and he was traveling there, that they
5  had concerns.
6      Q.  Was Mr. Asghar a U.S. citizen?
7      A.  Yes.
8      Q.  And he had lived in the United States --
9      A.  For a long time.
10      Q.  Thirty years or so?
11      A.  Exactly.
12      Q.  Did you have any basis to believe that
13  Mr. Asghar would be engaged in any type of
14  terrorist activity?
15      A.  Not so much, no. I knew Mr. Asghar from
16  working with him at the bureau. In fact, when I
17  first came on board as a security specialist, as
18  an investigator, we would work down in the
19  Federal Reserve vault for eight, ten hours a day
20  with the folks down there, and it didn't -- you
21  know, as far as his actions or -- I didn't have

Page 24

1  any concern. My concern came when I asked for the
2  reason that was given for him going over there,
3  being that his mom was ill, and I pulled the
4  security folder and his mom is deceased. Yes,
5  that's when I began having concerns.
6      Q.  So after you got a call from Mr. Brent
7  that Mr. Asghar should be redlined and you learned
8  that he had not been redlined, what was the next
9  thing that happened?
10      A.  I redlined him. I called over there and
11  made sure it was redlined.
12      Q.  What happened after that?
13      A.  I pulled video film of Mr. Asghar coming
14  into the bureau.
15      Q.  And why did you do that?
16      A.  Just to see what Mr. Asghar was doing in
17  the bureau when he wasn't supposed to be here.
18      Q.  What was he doing?
19      A.  Basically, the first video I have of him
20  would have been Mr. Asghar walking through -- I
21  don't know if you're familiar with the Bureau of

Page 25

1  Engraving and Printing, but there is a tunnel that
2  runs underneath 14th Street. There is an entrance
3  which we called BM5.
4      Mr. Asghar, I see him walking towards
5  that exit/entrance and he's with another young man
6  that works at the Federal Reserve vault.
7      I see Mr. Asghar going out of that
8  entrance and then coming back in with a carpet
9  rolled up. Not a big carpet, like a small carpet
10  about that big around; him handing it to the
11  individual on the other side of this -- of what we
12  call a magnetometer where he would have to walk
13  through, and then Mr. Asghar walked through the
14  magnetometer and then back out one of other doors
15  on the opposite side.
16      Then I got concerned, because the carpet
17  was never brought through the magnetometer, so I
18  didn't know if there was anything in the carpet,
19  an explosive device, anything, anything that could
20  relate to the security of the building and the
21  people in it.

7 (Pages 22 to 25)

Glen E. Alonso

Page 26

1    Q.  Now, was Mr. Asghar told that he could
2  not enter the building?
3    A.  Not at that time, no. No, usually when
4  you're redlined, if I'm there with you, I will
5  tell you, "Yeah, you're being redlined until such
6  time as you get this straight."
7    Q.  Then what happened next?
8    A.  Then I made sure that he was redlined,
9  and in fact he was redlined. I spoke to the
10  individual whom he gave the carpet to.
11    Q.  Who was that person?
12    A.  I really don't recall his name. And he
13  explained that he had no idea why Mr. Asghar had
14  given him this carpet. They both worked at the
15  Federal Reserve vault. I think they were --
16  Mr. Asghar and him were of Muslim faith and he was
17  bringing him this carpet, I guess for religious
18  purposes.
19    So I said fine, and that was it as far
20  as that individual is concerned.
21    I get a call on November 2nd of 2004

Page 27

1  that Mr. Asghar is at one of our entrances and
2  they're not allowing him to come in because I have
3  redlined him.
4    Q.  Okay. What is your tour of duty? What
5  time do you normally work?
6    A.  Usually six, 6:30 until about three,
7  3:30.
8    Q.  What happened after you got this call
9  that Mr. Asghar was at one of the entrances?
10    A.  I went down and I saw Mr. Asghar, told
11  him why he was being redlined, because I needed to
12  talk to him, and he said he needed to go to the
13  credit union, and I said, "Fine, come on, I'll
14  walk you to the credit union" so he could finish
15  conducting his business, and he agreed to come
16  upstairs and talk to me as far as his trips to
17  Afghanistan were concerned.
18    So I waited for him at the credit union.
19  After he have conducted his business, we went up
20  to my office and sat down and had a conversation.
21    Q.  What was said in this conversation?

Page 28

1    A.  I informed Mr. Asghar that the reason
2  that I was asking him these questions was based
3  on, one, OPM has directives with regards to
4  foreign contacts where we have to ask individuals
5  certain questions with regards to travels outside
6  of the United States. And this is especially to
7  certain countries. Afghanistan being one that we
8  were in conflict with at the time, would have been
9  one of those countries.
10    So that was one of my conversations with
11  Mr. Asghar. I wanted to make sure that he was
12  okay, his family was okay, that he wasn't being
13  blackmailed or anything like that or to make sure
14  that nobody ever there asked him to join a
15  subversive group, to come back to the United
16  States carrying anything or to assist anybody in
17  entering the United States, the borders of our
18  country.
19    Q.  And what was Mr. Asghar's response?
20    A.  He advised me that he had gone over
21  there based on the fact that his father had died

Page 29

1  back in -- I think it was -- I'm not sure if it
2  was in the '90s or 2001, it was a while ago, and
3  that his father had owned a lot of property valued
4  at, I think he said, $20 million, and that since
5  2001 -- so his father died prior to 2001, and that
6  in 2001 he was notified basically that he could
7  recoup the property that his father owned over
8  there through legal channels, through proper legal
9  channels, and that's why he decided to go over
10  there, to reclaim the property.
11    I asked him about his mom, that, you
12  know, the confusion that was there, and he advised
13  me that he did not tell his supervisors that his
14  mom was critically ill or anything like that.
15    Then our conversation went on to the
16  point where I was rather excited about what he was
17  doing, because my mother was from Cuba, and I had
18  property, supposedly, in Cuba that I wanted to get
19  back, so I was asking him, you know, what channels
20  he had gone through, just to see how the system
21  would work.

8 (Pages 26 to 29)

Glen E. Alonso

Page 34

1    A.  Yes.
2    Q.  Did you speak to anyone else or did you
3  speak to anyone before you contacted the State
4  Department?
5    A.  Probably Dave, Mr. Lindsey, chief
6  Lindsey.
7    Q.  Did you speak to Mr. Brent or anyone in
8  that group?
9    A.  No.
10    Q.  What information did you provide to the
11  FBI?
12    A.  Basically, Mr. Asghar's information, his
13  personal information, the dates that we were --
14  had for him traveling there, the discrepancy with
15  the issue about his mom being critically ill, but
16  yet he listed her as being deceased on his
17  security forms; any relatives that he had listed
18  on his investigations form.  All that information
19  was given to them.
20    Q.  Did you provide the name of his wife?
21    A.  Yes, I did.

Page 35

1    Q.  And --
2    A.  Oh, that was another thing, that she
3  also worked at -- I believe it was one of the
4  airlines.
5    Q.  Mr. Asghar's wife worked at one of the
6  airlines?
7    A.  That's what I had, yes.
8    Q.  What personal information did you
9  provide to the FBI?
10    A.  As far as what?
11    Q.  Well, you said the first thing you
12  provided was personal information.
13    A.  That's correct, name, Social Security
14  number, passport number, where he lived, date of
15  birth.
16    Q.  What information did you provide to the
17  State Department?
18    A.  Basically the same thing.  The State
19  Department, we just provided information on
20  Mr. Asghar and nobody else.
21    Q.  So you decided to redline Mr. Asghar?

Page 36

1    A.  Correct.
2    Q.  And you informed Mr. Brent that
3  Mr. Asghar was redlined?
4    A.  Yes.
5    Q.  What was Mr. Asghar's leave status when
6  he was redlined?
7    A.  Leave without pay.
8    Q.  And why was he placed on leave without
9  pay?
10    A.  I don't know.
11    Q.  Who made the decision that he would be
12  placed on leave without pay?
13    MS. WHITAKER:  Objection.  There's no
14  foundation.  It's speculation.  You can answer.
15  BY MR. BRANCH:
16    Q.  Who made the decision that he would
17  receive leave without pay?
18    A.  I don't know.  I'm assuming his
19  supervisors.
20    Q.  How do you know he was placed on leave
21  without pay?

Page 37

1    A.  I think Mr. Brent advised me of that.
2    Q.  And the reason why he was redlined was
3  to --
4    A.  So that I could question him, could talk
5  to him.
6    Q.  So that you could conduct some type of
7  investigation?
8    A.  Correct, inquiry, yes.
9    Q.  Do you know why he was not given leave
10  with pay on while you conducted this inquiry?
11    A.  I have no idea.
12    Q.  How long did you speak to Mr. Asghar?
13    A.  Probably an hour, hour and a half.
14    Q.  And at the end of that conversation, you
15  told Mr. Asghar that the FBI would be contacting
16  him?
17    A.  Correct, they would be contacting him to
18  talk to him, and after they spoke to him, then
19  they would call me and I could go ahead and call
20  Mr. Brent and I would call Mr. Asghar and inform
21  him that he could come back to work.  Which was no

10 (Pages 34 to 37)

Glen E. Alonso

Page 38

1  problem, because he said he wasn't coming back
2  until January 6th, anyway, so it all fell into
3  place.
4      Q.  Mr. Asghar told you he was not coming
5  back until January the 6th?
6      A.  Correct.
7      Q.  What was he trying to do on the day that
8  you redlined him?
9      A.  Oh.  He had something financial.  I
10  didn't get involved in it.  Something to do with a
11  check.
12      Q.  But when he tried to come in at six in
13  the morning, was he trying to come to work?
14      A.  When was this?
15      Q.  Well, you said you worked -- maybe I
16  didn't get my facts straight.
17      A.  No, he didn't come in that morning until
18  10:50.  The morning I spoke to him?  10:50 is when
19  he came to the bureau and was redlined, or I came
20  down and picked him up.
21      Q.  And he was going to the credit union on

Page 39

1  that day?
2      A.  Yes.  He wasn't coming to work.
3      Q.  Did you receive a call on some other day
4  where Mr. Asghar was attempting to come to work?
5      A.  No.  In fact, I ran his badge through
6  the security system, and he didn't -- until such
7  time as I called him and told him that it was okay
8  to come back, he didn't come back until November
9  29th, after Thanksgiving.  So I ran his badge
10  through all the days from November 2nd on forward,
11  and he never came into the bureau.
12      Q.  On November 2nd, is that the day that
13  you redlined him?
14      A.  No, that's the day that I interviewed
15  him.
16      Q.  When you interviewed him, had he already
17  been redlined?
18      A.  Yes.
19      Q.  Do you remember the day that he was
20  redlined?
21      A.  It had to have been right after the day

Page 40

1  he came in with the carpet, because I was called
2  and I was shocked that he came in the bureau,
3  because they advised me that he had been redlined,
4  but that wasn't the case.  So I would have done
5  that immediately.  So I think it was the 29th.  I
6  believe it was the 29th.
7      Q.  So October 29th, you believe he was
8  redlined.
9      A.  Without my notes, I can't really
10  honestly answer that correctly, yes.
11      Q.  So just so I have the facts straight
12  here, he was redlined on or about October 29th,
13  and then he returned to the bureau to conduct some
14  type of financial transaction at the credit union
15  or some type of business at the credit union, and
16  that's the day that you interviewed him.
17      A.  Correct.
18      Q.  And during that conversation, you told
19  him that he had been redlined.
20      A.  Well, he knew that, because he couldn't
21  get in the building.  He knew that right away.

Page 41

1      Q.  So on the day that he came to do the
2  business at the credit union.
3      A.  Yes.
4      Q.  And at that meeting, you told him -- I
5  mean, he learned that day that he had been
6  redlined.
7      A.  Yes.
8      Q.  And he could not come back to work until
9  it --
10      A.  Until it was cleared.
11      Q.  Until it was cleared.
12      A.  Yes.
13      Q.  So from that day, I guess November 2nd,
14  until the end of November, he could not come into
15  the building.
16      A.  Correct.
17      Q.  And therefore, he could not come back to
18  work.
19      A.  He wasn't coming back to work.  He said
20  that worked fine, because he had to be available
21  for attorneys that might have called from

11 (Pages 38 to 41)

Glen E. Alonso

Page 42

1  Afghanistan. He said he had to leave immediately
2  for those purposes, for court purposes over there,
3  and he had to go visit his brother-in-law or
4  brother in Australia for a period of time of two
5  weeks.
6      So he said, you know, he wasn't planning
7  on coming back until January 6th, so I said,
8  "Fine, they will definitely talk to you before
9  then and we can have all of this taken care of."
10     Q.  Did you take notes of the conversation?
11     A.  Yes, I did.
12     Q.  Did you include in any of your notes
13  where he said he wasn't coming back until January
14  6th?
15     A.  Yes, I'm sure I did. If I can see my
16  handwritten notes, it should be in there.
17     MR. BRANCH:  Are these notes that you
18  send over?
19     MS. WHITAKER:  I think if you look in
20  the report of investigation, there is a
21  declaration. I'm not sure what tab it is, but if

Page 44

1  until January 6th."
2      Q.  Where do you see that, return...
3      A.  Here. Here on the bottom.
4      Q.  Okay. Where on the bottom?
5      A.  Right here. Your index finger is on it.
6      Q.  I see that.
7          Now, your comment here, "Will return
8  after January 1," was that in response to your
9  question to Mr. Asghar of how long he had
10  requested leave?
11     A.  It could have very well been.
12     Q.  There is nothing here that says that
13  Mr. Asghar was not prepared to return to work
14  right away.
15     A.  There should be -- there are some more
16  notes. There should be some more handwritten
17  notes where he indicated that he was not planning
18  on returning, because he could have been called
19  away, and that he was going to visit two weeks
20  with his -- it was either brother or
21  brother-in-law. I don't see that it's on here.

Page 43

1  you can hold on.
2      Do you mind if I show this to the
3  witness?
4      MR. BRANCH:  Hold on a second.
5      (Mr. Branch left the room briefly.)
6      MS. WHITAKER:  If you looks all on page
7  103 and 155, I think those reflect his notes. And
8  also, you received another copy of his notes
9  today. 155.
10     BY MR. BRANCH:
11     Q.  Okay, so you, Mr. Alonso, your notes, if
12  you will take a look there, you said that you
13  indicated that Mr. Asghar told you that he had not
14  planned to come back to work until January the
15  6th.
16     A.  Yes. Here it is right here. "Leave
17  without pay until January 6th."
18     Q.  Is it your testimony that Mr. Asghar
19  told you that?
20     A.  That's correct. It says "Will return
21  after January 1st to work. Leave without pay

Page 45

1  There should have been a back page to this.
2      MS. WHITAKER:  Maybe that's what
3  happened.
4      BY MR. BRANCH:
5      Q.  What did you do with these notes after
6  you completed them? Did you store them in your
7  desk or in a file?
8      A.  Yes. I have a locked safe at work where
9  I keep all of these.
10     Q.  Do you have copies?
11     A.  Yes. I have the originals.
12     Q.  You have the originals?
13     A.  Yes. In fact, this would have been
14  typed up after my interview. Where it says Ali
15  Asghar on the top, page 153 to 155.
16     Q.  Are you willing to give these to Ms.
17  Whitaker or to the agency attorney?
18     A.  Sure.
19     MS. WHITAKER:  But as he just pointed
20  out, 155 represents the typed version.
21     THE WITNESS:  Yes, normally after I do a

12 (Pages 42 to 45)

Glen E. Alonso

Page 46

1  interview, time permitting, I will go to my
2  computer and I will type everything out, because
3  that's when my recollection is the best,
4  naturally.
5      MR. BRANCH: Well, will you send me a
6  copy of the --
7      THE WITNESS: Yes.
8  BY MR. BRANCH:
9      Q. All right. So after.
10     A. Here it is right here. "For the next
11  two weeks, he plans to travel to Australia to
12  visit with his family there. He intends to return
13  to work at the BOP on January 6, 2005, as
14  initially discussed with his supervisors." It was
15  in there.
16     Q. So I understand, Mr. Asghar was redlined
17  so you could conduct this inquiry, correct?
18     A. Yes, sir.
19     Q. What was the next thing that happened?
20     A. I received a phone call from the FBI --
21  I think his name was Ginsberg, Agent Ginsberg --

Page 47

1  indicating that he had visited Mr. Asghar, that
2  the questioning was done and that Mr. Asghar was
3  fine, he was good to go.
4      And that was early in the morning I got
5  a phone call, because I couldn't believe an FBI
6  agent would be working that early.
7      So I immediately called Mr. Asghar,
8  because he had given me his cell phone number and
9  his home phone number. I think I called him about
10  eight, 8:30 in the morning, indicating, "Hey, Ali,
11  everything checks out, everything is fine; we're
12  talking off the redline; you can come back to work
13  whenever." So that was it.
14     Q. Did anyone at the agency inform you at
15  any point that there was a suspicion that
16  Mr. Asghar either could be a terrorist or could
17  bring a bomb into the building?
18     A. May have; I don't remember, to be honest
19  with you.
20     Q. Is that something you would have made a
21  note of?

Page 48

1      A. Most definitely.
2      Q. Did you speak to Ms. Jackson, Felicia
3  Jackson?
4      A. No. I just got e-mails from her. I
5  mean, I didn't get e-mails from her, I got e-mails
6  from -- she had e-mailed Mr. James Brent and I
7  received the e-mails from Mr. Brent pertaining to
8  what Felicia Jackson had sent him.
9      I may have spoken to her once. I don't
10  want to say I didn't, because I may have.
11     Q. Did Ms. Jackson tell you that
12  Mr. Asghar -- or that she had a concern that Mr.
13  Asghar could bring a bomb into the building?
14     A. I don't really remember that. That, I
15  think, would have stuck, to me.
16     Q. Did Mr. Asghar say or do anything which
17  led you to believe that he might be a terrorist?
18     A. Everything that I was looking at, I had
19  concerns. It was -- I was struggling, because I
20  knew him. I felt I knew him; I felt I'm a good
21  judge of character. But the fact that the

Page 49

1  information pertaining to his mother, the fact
2  that she had already been deceased and the fact
3  that his wife worked at the airlines and the fact
4  that he had made -- this was his second trip over
5  there, the fact that several of the countries that
6  he had visited previously, where he had stated he
7  had visited, were countries that came in in
8  different intelligence reports for gathering
9  places for terrorist groups.
10     So, yeah, I struggled with the idea, and
11  could he have been? He could very well have been.
12  My job was the security of the bureau, and I was
13  going to look out for people and the bureau, so I
14  did what I had to do as far as investigating the
15  case.
16     Q. Did you do anything else after you
17  received this report back from the FBI?
18     A. No. When I called him, I said, you
19  know, "Welcome back. Great to have you back."
20  That was it.
21     Q. Was that the end of November?

13 (Pages 46 to 49)

Glen E. Alonso

Page 54

1    A.   I would have received this from
2    Commander Kuch.
3        Q.   Is he with the Secret Service?
4        A.   No, he's the commander of the police
5    force at the Bureau of Engraving and Printing.
6            Normally when a law enforcement agency
7    comes in contact with one of our employees or one
8    of our employees who identifies himself as one of
9    our employees, as Mr. Asghar did, they will
10   contact security for the agency and advise them as
11   to what took place.
12           In this situation here, there was an
13   incident report written by the police officer
14   which was supplied to Commander Kuch, who in turn
15   provided this to me, as the assistant chief, and
16   also to the chief, David Lindsey.
17       Q.   And what was the incident report, the
18   import of it?
19       A.   Basically, that Mr. Asghar had been over
20   in Lafayette Park --
21           MR. BRANCH:  Objection to the relevance

Page 55

1    of any of this.
2    BY MS. WHITAKER:
3        Q.   You can still --
4        A.   Basically, that he was at Lafayette Park
5    on May the 2nd, 2005, at 0745 hours.  During that
6    period of time, they classify as a POTUS movement,
7    meaning the President was on the move.
8            The officer at the time -- I don't see
9    it; his name is on here somewhere; I just saw it a
10   minute ago -- he indicated that Mr. Asghar had
11   approached him -- Sgt. Mike Wallace -- indicated
12   that Mr. Asghar had approached him and requested
13   to speak to a Secret Service agent, that basically
14   he knew the whereabouts of Osama Bin Laden and
15   needed to talk to the president, and showed him
16   his Bureau of Engraving ID, his credentials, which
17   we call a SAC badge, and that's when they took a
18   report, took the information down and forwarded
19   the information on to us.
20       Q.   Okay.  And just before that SID 5, there
21   is a document that's identified as SID number 4.

Page 56

1    Can you explain what that document is?
2        A.   That's basically in the Bureau of
3    Engraving and Printing personnel handbook.  This
4    is indicating the reporting of foreign contacts.
5        Q.   What is the --
6        A.   All U.S. Government employees are
7    required by Presidential Decision, Directive PDD
8    12, dated 8/5/93, to report to their security
9    officers all contacts with individuals of any
10   nationality, either within or outside the scope of
11   the employee's official activities in which, one,
12   illegal or unauthorized access is sought to
13   classified or otherwise sensitive information, or
14   two, the employee is concerned that he or she may
15   be the target of actual or attempted exploitation
16   by a foreign entity."
17           Do you want me to continue?
18       Q.   No.  Is this the section that requires
19   the supervisors to report travel to foreign
20   countries, extended travel to foreign countries?
21       A.   Yes.  This is one, and there is also

Page 57

1    another one in the regular Bureau of Engraving and
2    Printing security manual, which everybody would
3    have access to.
4            MS. WHITAKER:  We certainly will get you
5    a copy of that.
6    BY MS. WHITAKER:
7        Q.   And in light of that, in the report of
8    investigation, there is an e-mail.  I don't know
9    whether you have seen it.  It's from Mr. Brent to
10   David Lindsey, your supervisor, dated August 5th,
11   2004.  It's on page 101, Mr. Branch.
12           Would you mind reading it and telling --
13       A.   It's from James Brent, sent Thursday,
14   August 5th, 2004 at 10:06 a.m. to David Lindsey.
15   "This e-mail is for information purposes only," is
16   the heading.
17           "I have an employee from the Federal
18   Reserve vault, Ali Asghar, KG-5, currency shipment
19   checker processer, that recently requested and was
20   approved for a leave of absence from employment at
21   the BEP.  This leave of absence was for a period

15 (Pages 54 to 57)

Glen E. Alonso

Page 58

1  of six months, July, 2004 to December, 2004, and
2  was the second request this year. According to
3  his immediate supervisor, Felicia Jackson,
4  Mr. Asghar traveled to Afghanistan during both of
5  his requests for a leave of absence. Please call
6  me if you need additional information."
7      Q.  Is this the type of reporting
8  requirements that are required under the --
9      A.  Yes.
10     Q.  -- bureau's guidelines?
11     A.  Yes, that's what should take place, yes.
12     Q.  Do you recall seeing this?
13     A.  No, I really don't.
14     Q.  Now, getting back to the initial
15  disclosures, there are e-mails that you provided
16  to Ms. Serenco, and they commence on page SID
17  number 2, for your reference.
18         Do you mind reviewing those and
19  indicating whether you knew of them at the time or
20  whether you have received them?
21     A.  Yes.  This was from Mr. Robert Bernhart.

Page 59

1      Q.  This is the first one?
2      A.  This is the first one I am looking at,
3  SDI number two.  It was sent to me Wednesday,
4  August 11th, 2004, at 11:27 a.m., and it's
5  directed to me with a carbon copy, or cc to James
6  Brent and the subject is Mr. Asghar, Ali Asghar.
7      Q.  And who is it from?
8      A.  Robert Bernhart.
9      Q.  Do you know him?
10     A.  Yes, I do.
11     Q.  And who is he?
12     A.  Would be in Mr. Asghar's chain of
13  command.  Supervisory chain, excuse me.
14     Q.  Is he responding to something that you
15  may have sent him?
16     A.  Yes.  It says "Glen, in reference to
17  Mr. Asghar's previous and present extended leave
18  of absences, Mr. Asghar and I spoke on a couple of
19  occasions about his need for leave of absence.  He
20  stated to me that he needed the time off due to
21  the fact that his mother had terminal cancer and

Page 60

1  that he needed to assist her in her care. Please
2  let me know if I can be of any assistance."
3      Q.  Was this one of the first documents you
4  received when you began your investigation?
5      A.  This one, and also the one from James
6  Brent with regards to Felicia Jackson, indicating
7  the same thing.
8      Q.  Okay.
9      A.  This is what I requested from Mr. James
10  Brent so that I could verify what I was looking at
11  in the security folder indicating that his mother
12  had passed away.  I wanted to verify that.
13     Q.  Okay.  One of the questions that you
14  were asked was concerning Mr. Asghar's status in
15  terms of his leave, and you indicated that
16  Mr. Brent placed him on leave without pay.  Do you
17  know that for a fact?
18     A.  No.  I know one of his supervisors
19  approved leave without pay.  Usually leave without
20  pay up to a certain point has to be approved by
21  the office chief, which Mr. James Brent is.

Page 61

1      Q.  And in your typewritten summary of your
2  notes, which appears at SID 3, I think you
3  testified already that SID 3 relates the summary
4  of those handwritten notes that we saw --
5      A.  Correct.
6      Q.  -- and some that appear to be missing.
7         (Discussion off the record.)
8  BY MS. WHITAKER:
9      Q.  I think, Mr. Alonso, you have already
10  testified that this represents the transcription
11  of notes that you took immediately after you
12  interviewed Mr. Asghar; is that correct?
13     A.  Correct.
14     Q.  And these would be a better indication
15  of your recollection of what occurred --
16     A.  Yes.
17     Q.  -- in -- there is no date on it, but
18  in --
19     A.  November 2nd, 2004.  It was on that
20  date, right after I got done interviewing
21  Mr. Asghar.

16 (Pages 58 to 61)