Attachment 9

**AFFIDAVIT OF GLEN ALONSO, Assistant Chief, Office of Security**

**City of Washington**
**District of Columbia**

1. Please identify yourself for the record (name, title, grade, series, organizational name and location.
   **Glen E. Alonso Sr., Assistant Chief, Office of Security, GS-14, 0080, Bureau of Engraving and Printing, Washington, DC.**

2. Please state your race, national origin and religion.

   **Caucasian, Hispanic, Catholic**

3. Please provide a short description of your current professional role with the Agency.

   **Assistant Chief, Office of Security.**

4. Were you serving in this role as of November 2004? If not, please provide a short description of your professional role with the Agency as of this date.

   **No, I was the Special Assistant to the Chief, Office of Security. My title changed but my duties remained the same.**

5. Please describe your professional relationship to the Complainant, Ali Asghar, and the duration of that relationship.

   **I met Ali in 1997, while working in the Federal Reserve Vault as a Security Specialist. During that time frame Security Specialists were required to work one full day, on a rotating schedule in the Federal Reserve Vault. I would only have contact with Ali maybe once or twice every two or three months. This was other than seeing him while working at the BEP. No other contact.**

6. Were you aware of the Complainant's race, national origin and religion? If so, please state when you gained this awareness.

   **I never paid much attention to it, but in approximately August of 2004, I was notified by James Brent, Ali's supervisor, that Ali had requested and was granted a leave of absence due to having to return to Afghanistan. I am still not aware of what his Religion is. I can only assume that since he is from**

Attachment 9

1 of 7
146

**Afghanistan he is Muslim.**

7. Were you aware of the Complainant's prior participation in the EEO process? If so, please state when and how you gained this knowledge.

   **I was asked to participate in an Alternative Dispute Resolution procedure regarding Ali Ashgar. Other than this I have no other knowledge of any EEO complaints.**

The Complainant alleges he was subjected to harassment, based on his race (Asian), national origin (Afghanistan), religion (Muslim), and reprisal for prior EEO complaint activity when:

   a) on November 8, 2004, he was questioned by a security officer, escorted out of the building, advised not to return until contacted by security, and told that the reason for the investigation was because he might be involved with a terrorist group;

   **On November 2, 2004, I escorted Ali Ashgar to the BEP Credit Union, because I had him "red lined" (Not allowed to enter the BEP without first contacting Security). I escorted Mr. Asghar to the BEP Credit Union waited for his transaction to be concluded, and then asked him to accompany me to my office to answer some questions. I explained to Ali as to why the BEP was concerned about his latest travels and that we needed to be certain that he was not part of any subversive group or being blackmailed into supplying information about the BEP. I mentioned that he advised his supervisor that he needed to go to Afghanistan because his mother was sick and that she was not going to make it. During my review of his Security File, his Standard Security Form reflected by his written omission that his mother had passed away several years prior. This contradicting information raised questions that needed answering. This was explained to Mr. Asghar in detail and he advised that he understood. I also advised that an agent from the FBI would be calling him to arrange for an interview, and once confirmed that everything was OK we would again be granted access into the BEP.**

   b) on November 23, 2004, at the request of the BEP, an FBI agent visited him at his home;

   **I contacted the FBI, in the normal course of business involving suspicious travel, with the information on Ali Ashgar. They advised that they wanted to interview him based on his trips to Afghanistan and the information supplied. I also wanted to make sure that Ashgar was not being used by any subversive group that may be blackmailing him or his family for BEP information.**

147
2

c) on November 26, 2004, his supervisor remarked that the reason that she called security on him was because he "might bring a bomb into the building because he is a terrorist;" and

**I have no knowledge of this.**

d) on January 4, 2005, his supervisor made derogatory comment in front of his coworkers, referencing his wife and his trip to Afghanistan?

**I have no knowledge of this.**

8. Please respond to each of the alphabetized claims above. Be specific in describing what happened, when and indicating who was involved. You may place your response(s) in bold print directly beneath each alphabetized claim.

**In support of the claims above, the Complainant made the following statements:**

- The Complainant states that he went to the BEP during the week of November 3rd, 2004 to deliver some gifts to his coworkers that he had brought back from Afghanistan, but he was not returning to work at that time. He states his badge allowed him in and was in a green status. However, when he returned to work on November 8, 2004 his badge was in a red status and he could not get into the building. The security officer, Glen Alonzo took him upstairs to his office and asked him many weird questions and then escorted him out of the building, telling him not to come back until he was called by him (Mr. Alonzo). The Complainant further states that after a couple of weeks, he called Mr. Alonzo and asked about his employment status. Mr. Alonzo told him that he (Complainant) was still being investigated by him (Mr. Alonzo) and he (Mr. Alonzo) thinks he (Complainant) may be involved in a terrorist activity and they informed the FBI and the FBI would conduct their investigation; then they will make a decision about him. When the Complainant asked Mr. Alonso what he mean by that, he said, "Oh, you might be involved with another terrorist group the last two weeks that we did not see each other and you will be visited by an FBI agent soon."

    **I believe Mr. Asghar is some what confused on his dates and other information. Mr. Asghar came to the BEP on Wednesday, October 27th, 2004, at approximately 10:32 am to give a gift to one of his coworkers. His SAC (Security Access Control) badge at this time allowed his entry because he was not red-lined. His visit is captured on video and SAC card reader records. This evidence is in my possession. Mr. Asghar came to the BEP on Tuesday, November 2nd, 2004, to conduct business at the BEP Credit Union. This is also documented by credit union personnel and records.**

148

3 of 7

On November 2, 2004, Ali Asghar attempted to enter the BEP and was notified that he had been red-badged (denied access). I was the initiator in restricting Mr. Asghar's entrance to the BEP. This restriction was based on the information that Asghar had traveled to Afghanistan on two known occasions and his reasons for going. I escorted Asghar to the BEP Credit Union, where he had intended to go originally, upon completion of his transaction he was interviewed by me in my office in room 510a.

Asghar was advised that this interview was to note if while in a foreign country if he had any contacts or propositions requesting favors or entry into the US, according to OPM guidelines on foreign travel.

Asghar reported that he had traveled to Afghanistan twice this year, once in March returning to the U.S. in June, again in July and returned to the U.S. on October 23, 2004. Asghar indicated that he went to Afghanistan because he inherited property there after his father's death, but was unable to claim the property due to the political climate at that time.

In 1981, Asghar's father passed away in Afghanistan, there was no family in the region and subsequently Asghar's properties were taken over by unknown people. After September 2001, when the United States restored the government in Afghanistan he and other Afghanistan's were advised that they could return to Afghanistan to claim the properties that were rightfully theirs with proof of ownership. Asghar upon receiving this information traveled to Afghanistan in March 2004, hired an attorney and started the process to obtain his inherited property and returned to the US in June. Asghar returned to Afghanistan in July of this year for court appearances. Ashgar advised that he has won his cases for his properties but some are under appeal and he may have to return at a moments notice. Asghar mentioned that the worth of the properties is estimated at approximately 20 million dollars.

Asghar advised that he stayed in his home town of Timany in Kabul in one of the houses that he recouped. He has a cousin who is staying in the house while he is away.

Asghar indicated that he was not approached by anybody attempting to ask for favors or request assistance in getting into the US. He indicated that the area was quiet and that he was not in any immediate danger.

Asghar was asked how he was surviving financially. He advised that he had cashed in his Thrift Savings to subsidize his savings account

Asghar was advised that he would still need to meet with the Federal Bureau of Investigations who was interested in interviewing him on his recent travel. Asghar indicated that he would be available unless called to return to Afghanistan. He is remaining in the US for the next two

149

4 of 7


- weeks with plans to travel to Australia to visit with his family there. He intends to return to work at the BEP on January 6, 2005, as initially discussed with his supervisors.

- On November 23, 2004 the FBI agent showed up at his home in Woodbridge wearing guns which scared his pregnant wife. The agent came in (for approximately 45 minutes) and asked him lots of questions. When the Complainant told the agent what was going on between him and his supervisor (Mrs. Felicia Jackson) and her manager (Mr. James Brent), he was told by the agent that a request from Mr. Alonzo had brought them (FBI) to the house. The FBI agent told him that if he needed assistance in the future, let him (FBI agent) know. The agent stated that the BEP investigates their employees on a regular basis and that the FBI should not have been called for this. Complainant believes that his wife had a miscarriage due to the stress and fear of these events.

  **I contacted the FBI Terrorism Task Force to a check on Mr. Ashgar and explained the circumstances surrounding Mr. Ashgar's recent travels. They were also advised as to his reasons for requesting a leave of absences. They advised that they would interview Mr. Asghar along with checking his name on their database. What took place at Mr. Asghar's residence is unknown to me.**

  **The Agent is Chris Ginsburg and he can be reached at (202) 278-4470.**

- On November 26, 2004, Mr. Alonso called him at home and stated that he could come back to work. Due to the Thanksgiving holiday, he returned to work on November 29, 2004 and the same day he spoke to Ms. Marlene Churchill in the ADR office to discuss the harassment. The Complainant states there are three supervisors in the section where he works (Mr. Antoine Johnson, Mr. Ron Alexander and Mrs. Felicia Jackson). When Mr. Johnson and Mr. Alexander became aware of the situation, they asked Mrs. Jackson why she called security on Complainant. Mrs. Jackson responded, "he might bring a bomb in the building because he is a terrorist."

  **I called Mr. Asghar on November 22, 2004, the same day that Agent Ginsburg called me and advised that Asghar was OK.**

- On January 4, 2005, his supervisor, Mrs. Felicia Jackson, made derogatory comments about his wife being pregnant in front of all his coworkers and she was saying Complainant's wife must have been with another man since the Complainant had been in Afghanistan for several months.

  **I do not have any information on this.**

150

5 of 7

- The Complainant believes he was removed from the Acting Supervisor program because Felicia Jackson and Mr. James Brent believed he was a terrorist and did not want him to have access to BEP computers.

**I do not have any information on this.**

9. Please respond to each of the bulleted supporting claims above by placing your response in bold print directly beneath each claim.

10. Did Complainant report the alleged incidents in this complaint as harassment to you? If so, in chronological order, provide the date(s) of your discussion(s) with Complainant and describe the substance of the discussion(s).

    **No**

11. Did you discuss Complainant's allegations with anyone else before Complainant filed this complaint? If so, in chronological order, provide the name(s) of this/these individual(s), provide the date(s) of your discussion(s) and describe the substance of the discussion(s).

    **No**

12. What steps, if any, did you take to address Complainant's allegations (for example, did you yourself do an inquiry into the matter; did you appoint someone to do an internal investigation regarding the allegations, etc.)? If steps were taken, and documentation regarding Complainant's allegations was created, please provide a copy of the documentation.

    **N/A**

13. Did you take any corrective action(s) as a result of Complainant's allegations of harassment? If so, what were the corrective action(s) taken?

    **N/A**

14. What is the Agency's policy regarding changing the status of badges to "red?"

    **The redlining of an employees badge is actually suspending the access of the employee into the BEP. He/She is treated as though they are visitors and must be conducting business at the BEP and are escorted. This can only be done with the approval of the Chief, Office of Security or designee.**

15. What is the Agency's policy regarding requesting FBI investigation of an



151

6 of 6

employee?

**There is no policy, nor is one needed.**

16. Provide copies of all documents in your possession that may be relevant to this complaint or suggest documents to be reviewed in support of your position or which refutes the Complainant's allegations.

    **I have numerous documents and video that can be reviewed that support my statements. I did not discriminate against the Complainant.**

17. Please identify other witnesses who might have information to provide relating to the issues of this complaint and the information they may be expected to provide.

    **Everyone mentioned in this statement. The SF85p that was completed and signed by Asghar reflects that his mother and father are deceased. The date of the form is April 20, 2002.**

I have read the above statement, consisting of __7__ pages, and it is true and complete to the best of my knowledge and belief. I understand that the information I have given is not to be considered confidential and that it may be shown to the interested parties.

_____
(Deponent's Signature)

Subscribed and (sworn to) (affirmed) before me at _BEP in Washington, DC_ on this _15th_ day of _June_ 2005.

_____
(Investigator's Signature)

ALONSO's NOTES

FILE COPY

11/2/04.   ALI ASGHAR.

U.S. PASSPORT. — Run off TAKE CARE of people
1st. MARCH 17 — left. Returned June 1st. Worked 6
week then left again.
— 2nd. July 15, 2004 —

→ people took over property.

(1974) — left Afghanistan
1981 — father died

(2001 +) 2002 — gov. allowed people to return and
regain property

→ Had payment in order — etc
→ case was appealed —

returned to US last Sat Oct 23 —
lwyr. until Jan 6 etc
will return after Jan 1 to work

Survive own money —
Kabul — TIMANY staying — small house

Cell #
(571) 274-8744
(703) 497-2124

→ when he is called

153

ATTACHMENT 1

**Brent James**

From: Brent James
Sent: Thursday, August 05, 2004 10:06 AM
To: Lindsey David

This e-mail is for informational purposes only.

I have an employee from the Federal Reserve Vault, Ali Asghar (KG-5 Currency Shipment Checker Processor), that recently requested and was approved for a leave of absence from employment at the BEP. This leave of absence was for a period of 6 months (July 2004 - December 2004) and was the second request this year. According to his immediate supervisor, Felicia Jackson, Mr. Asghar traveled to Afghanistan during both of his request for a leave of absence.

Please call me if you need additional information.

**Alonso Glen**

**From:** Brent James
**Sent:** Wednesday, August 11, 2004 11:41 AM
**To:** Alonso Glen
**Subject:** FW:

FYI

-----Original Message-----
**From:** Jackson Felicia
**Sent:** Wednesday, August 11, 2004 11:39 AM
**To:** Brent James
**Subject:** RE:

He told me his mother was sick and that he didn't think she was going to make it. That was the first time he went over and he actually seem to be afraid to go over there. He told us all that he hadn't been there in 20 years or so. Hope this helps you.

-----Original Message-----
**From:** Brent James
**Sent:** Wednesday, August 11, 2004 11:37 AM
**To:** Jackson Felicia
**Subject:** RE:

Thanks. Did he offer you any reason for his absence?

-----Original Message-----
**From:** Jackson Felicia
**Sent:** Wednesday, August 11, 2004 11:35 AM
**To:** Brent James
**Subject:** RE:

Hi James,

The only thing I have is the two leave slips. The first one Antoine signed. The second one Bob signed. He didn't give me a letter nor did he give one to Antoine. I gave Angela the leave slip that Bob signed.

-----Original Message-----
**From:** Brent James
**Sent:** Wednesday, August 11, 2004 11:29 AM
**To:** Jackson Felicia
**Subject:**

I don't have any documentation on why Ali Asghar requested two extended leave of absences this year. Did he submit any paperwork to you or give you a reason for his absence? Let me know. Thanks.

156

1

Ali Asghar

On November 2, 2004, Ali Asghar attempted to enter the BEP and was notified that he had been red-badged. I was the initiator of the red-bagging, based on information that Asghar had left the United States and traveled to Afghanistan. I escorted Asghar to the BEP Credit Union, where he had intended to go originally, upon completion of his transaction he was interviewed by me in my office in room 522a.

Asghar was advised that this interview was to note if while in a foreign country if he had any contacts or propositions requesting favors or entry into the US, according to OPM rules and guidelines on foreign travel.

Asghar reported that he had traveled to Afghanistan twice this year, once in March returning to the U.S. in June, again in July and returned to the U.S. on October 23, 2004. Asghar indicated that he went to Afghanistan because he inherited property in there after his father's death, but was unable to claim the property due to the political climate at that time.

In 1981, Asghar's father passed away in Afghanistan, there was no family in the region and subsequently Asghar's properties were taken over by unknown people. After September 2001, when the United States restored the government in Afghanistan he and other Afghanistan's were advised that they could return to Afghanistan to claim the properties that were rightfully theirs with proof of ownership. Asghar upon receiving this information traveled to Afghanistan in March 2004 to hire an attorney and start the process needed to obtain his inherited property and returned to the US in June. Asghar returned to Afghanistan in July of this year for court appearances. Ashgar advised that he has won his cases for his properties but some are under appeal and he may have to return at a moments notice. Asghar mentioned that the worth of the properties is estimated at approximately 20 million dollars.

Asghar advised that he stayed in his home town of Timany in Kabul in one of the houses that he recouped. He has a cousin who is staying in the house while he is away.

Asghar indicated that he was not approached by anybody attempting to ask for favors or request assistance in getting into the US. He indicated that the area was quiet and that he was not in any immediate danger.

Asghar was asked how he was surviving financially. He advised that he had cashed in his Thrift Savings to subsidize his savings account

Asghar was advised that he would still need to meet with the Federal Bureau of Investigations who was interested in interviewing him on his recent travel. Asghar indicated that he would be available unless called to return to Afghanistan. He is remaining in the US for the next two weeks with plans to travel to Australia to visit with his family there. He intends to return to work at the BEP on January 6, 2005, as initially discussed with his supervisors.

155