UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|   |   |
|---|---|
| ALI ASGHAR, ) | |
| ) | |
| Plaintiff, ) | Civil Action No. 06-0400 |
| ) | (RJL) |
| v. ) | |
| ) | |
| JOHN SNOW, ) | |
| SECRETARY, ) | |
| U.S. DEPARTMENT OF TREASURY, ) | |
| ) | |
| Defendant. ) | |

## **PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS OR FOR SUMMARY JUDGMENT**

Comes now Plaintiff Ali Asghar, by and through counsel, and files Plaintiff's Opposition to Defendant's Motion to Dismiss or Motion for Summary Judgment, and in support thereof states as follows.

Introduction

Plaintiff Asghar, is a gentleman of Asian descent, and native of Afghanistan and a Shiite Muslim. He filed a complaint of discrimination against his employer, the Bureau of Engraving and Printing, after he endured years of a hostile work environment based on his race, religion and country of origin, and traveled to Afghanistan in 2004, and when he attempted to return to work, he was prevented from returning to work because his supervisor reported to co-workers and Agency management that he "might be a terrorist" and bring a bomb into the Agency. The Agency responded to the supervisor's wild and unfounded accusations by preventing him from returning to work for three weeks and

referring him to the FBI for interrogation. The Agency has moved for summary judgment. The motion should be denied because Mr. Asghar has presented evidence of a hostile work environment, see <u>E.E.O.C. v. Wc&M Enterprises, Inc.</u>, 496 F.3d 393 (5th. Cir. 2007), and discrimination; he was subjected to an adverse action; and the Agency retaliated against him for prior protected activity.

<u>Statement of Facts</u>

Plaintiff Ali Asghar is a native of Afghanistan and is a Shiite Muslim. Ex. A (Sworn Declaration of Ali Asghar, paragraph 1).

Mr. Asghar left Afghanistan in 1974 and studied in Europe and later resettled in New York and became a U.S. citizen. Id. at 2. His family remained in Afghanistan. Mr. Asghar had two brothers and five sisters. When Mr. Asghar grew up, his father had two wives at the same time and the family lived in the same house. Children from both wives lived together in the house. His birth mother died in 1993. Mr. Asghar referred to both women as his mother In May 1979, during the Soviet war in Afghanistan, the Soviet government took his two brothers and they were never heard from again. Id.

Mr. Asghar began working for the Bureau of Engraving and Printing in August 1995, and began working in the note packaging division. Id. at 3. Mr. Asghar worked at a work station similar to an assembly line where employees gathered bricks of currency, and each employee had a specific duty. Id. There were approximately 15 to 16 people working on the duty station and all were African American except Mr. Asghar. ID. In this position, Mr. Asghar was racially harassed virtually everyday by supervisors, managers and co-workers. . Those complaints alleged discrimination based on race, religion and national origin. The co-workers believed he was Palestinian, and called

2

him called him bomb maker, rock thrower and other derogatory names. Id.  All of the co-workers would harass him by calling him racially derogatory names.  One of Mr. Asghar's supervisors was Janice Browner, and she participated the harassment. Mr. Asghar filed EEO complaints in 1996-1998. Id.

In 1997, Mr. Asghar was transferred to the Federal Reserve Vault and he became a checker processor.  Id. at 5.  His supervisor was James Weaver, and he had an acting supervisor named Samuel Field, both African American.  Later Antoine Johnson became his supervisor, and he was African American as well.  Shortly after he arrived in the Federal Reserve Vault, his African American co-workers continued to harass him.  Id.  On one occasion, one co-worker came to his desk and unzipped his pants and put his genitals on Mr. Asghar's desk and said "this is how I treat you," like my penis.  Id. at 4.

After the 9/11 terrorist attack, the harassment by co-workers became intolerable. Id. at 5.   On several occasions, co-workers referred to him in racially derogatory terms, and would take white cloths or paper towels and wrap the cloth or towel around their heads like a turban and pretend to be Osama Bin Laden to harass Mr. Asghar.  Id.at 5.

James Brent, an African American male, has been a manager over the divisions where Mr. Asghar worked since 1995. Id. at 6.  Mr. Asghar complained frequently complained to James Brent about the racial harassment, and Brent's response was "This is a blue collar work environment, and if you don't like it, why don't you go somewhere else."  Id.  Mr. Asghar responded that he would not permit people who were prejudiced to force him to leave his job and that the Agency had a responsibility to prevent discrimination in the workplace.  Id.  No action was taken by Brent.  Id.

3

In approximately 2002, Felicia Jackson became Mr. Asghar's immediate supervisor. Id. at 7. Ms. Jackson is African American. Id. She made it known that she is Christian and very active in her church. Id. Before she became his supervisor, Mr. Asghar and Ms. Jackson worked together as co-workers. Id. At some point, she told Mr. Asghar she was saved by Jesus, and her conduct towards him changed. Id. After she became his supervisor, she stated on many occasions that her religion was the best religion and Islam was a violent religion. Id. Another supervisor attended church with Ms. Jackson, and on many work days, Ms. Jackson spent time during work hours performing church work in the office during work hours. Id.

Mr. Asghar filed EEO complaints in 1999-2000. Id. at 8. The last case was settled in February 2002. Id. at 8. As part of the resolution of that case, the Bureau was required to provide diversity training for employees, remove the supervisor and pay his legal fees. Id.

During the resolution of his EEO complaint, Mr. Asghar trained to be an acting supervisor from January 2002 until April 2003. Id. at 9. In April 2003, Felicia Jackson informed Mr. Asghar that he would no longer be acting supervisor. Id.

In 2003, Mr. Asghar applied for a position as a KG-7 Currency Verifier. Id. at 10. An African American woman, who was a personal friend of supervisor Antoine Johnson, was selected for that position in March 2003. Id. Mr. Asghar went to Bob Bernhart, the Assistant to James Brent, and complained to him about the selection. Mr. Asghar was told that could he not be an acting supervisor and compete for the KG-7 position. Id.

He did not file EEO complaints even though he believed the two personnel actions in 2002 and 2003 were discriminatory. Id. at 11.

In 2004, Mr. Asghar had to travel to Afghanistan on two occasions to take care of some family business. Id. at 12. In 2004, Mr. Asghar reported to Felicia Jackson and Antoine Johnson. Mr. Asghar's father owned land and other property in Afghanistan and Mr. Asghar went to Afghanistan to look for his brothers and attempt to reclaim family property. Id. In 2004, upon arrival in Afghanistan he went to each hospital and prison in Afghanistan that he could go to look for his brothers to interview hospital officials. Id.

Mr. Asghar requested leave from July 15, 2004 through December 31, 2004 to travel to Afghanistan to address family matters. Id. at 13. Mr. Asghar did not tell Felicia Jackson that his mother was critically ill, suffering from cancer and not expected to live. Id. His mother was in her 80s and did not have cancer when she died. Id. On occasions prior to 2004, Mr. Asghar requested up to six weeks of leave for travel, and would come back from travel early and would return to work, without incident. Id. For example, in December 2003, Mr. Asghar requested six weeks of leave for travel, and he returned from his travel in five weeks and immediately returned to work. Id.

During his absence, Felicia Jackson reported to James Brent and co-workers on at least two occasions that Mr. Asghar could be a terrorist, and could bring a bomb into the building. Id. at 14. Ms. Jackson had not information to support her claims that Mr. Asghar could be a terrorist and could bring a bomb into the building other than her knowledge that he traveled to Afghanistan on family business. Id.

On or about November 1, 2004, Mr. Asghar returned to the Agency building to his work location and delivered a gift to a co-worker. Id. at 15. He went to his supervisors' office to tell his supervisors, Antoine Johnson and Felicia Jackson, that he

5

was back in the country and ready to return to work and will be back next week at the beginning of the week. Id. Both said it was acceptable for Mr. Asghar to return to work. Id.

Mr. Asghar attempted to report for work on November 8, 2004, and his badge was inactive. Id. at 16. He went to his normal entrance, Entrance No. 5, and was told to go to the 14th Street entrance and he learned that his identification badge had been redlined. Id. He was sent to the C Street entrance of the building and there he requested that security call his supervisor, Felicia Jackson. Id. The security director, Glenn Alonso, met Mr. Asghar and asked him come upstairs to his office. Id.

Alonso interrogated Mr. Asghar for approximately 45 minutes. Id. at 17. At the conclusion of the interrogation, he told Mr. Asghar that he would not be permitted in the building; that the FBI had been contacted and the FBI would come to visit him and he could not go anywhere in the interim. Id. Approximately one week after being denied return to work, Mr. Asghar contacted Mr. Alonso to ask when he could return to work. Id. Alonso informed him at the time that he could have been involved in terrorist activity since the last time they spoke and he would soon be visited by the FBI. Id.

On or about November 23, 2004, armed FBI agents came to Mr. Asghar's home to interrogate him. Id. at 18. Mr. Asghar and his wife feared that the FBI would take him to Guantanomo Bay. Id. During the time, his wife was pregnant. Id. After the visit by the FBI, she became distraught and later suffered a miscarriage. Id. Ms. Jackson was later forced to apologize to Mr. Asghar for the comments she made about his unborn child which was now deceased, and she commented after she apologized, are you happy now.

6

**ARGUMENT**

Pursuant to Rule 56, "summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law," and "a party is only entitled to summary judgment if the record, viewed in the light most favorable to the nonmoving party, reveals that there is no genuine issue as to any material fact." "Summary judgment will not lie if ... the evidence is such that a reasonable jury could return a verdict for the nonmoving party."

Although the party moving for summary judgment has the initial burden of demonstrating to the court that there is no genuine issue of material fact, the moving party is not required to negate the non-moving party's claims before it can prevail on a motion for summary judgment.

A.    Disparate Treatment

A disparate treatment claim is analyzed under the three-stage framework set forth in <u>McDonnell-Douglas Corp. v. Green</u>. Under the McDonnell-Douglas framework, the complainant must first establish a prima facie case of prohibited discrimination. Once he has done so, the burden then shifts to the employer to articulate legitimate, nondiscriminatory reasons for the challenged employment decisions. Should the employer succeed in presenting such reasons, the burden then shifts back to the complainant, who then has an opportunity to discredit the employer's explanation.

7

Throughout this analysis, the burden of proof never shifts to the defendant, but always remains with the plaintiff.

To support his claim of disparate treatment, Mr. Asghar has the initial burden to make out a prima facie case that the agency discriminated against him on the basis of his race, religion, sex and national origin. If he does so, the burden of production–but not of persuasion–would shift to the agency, and the agency must then articulate a legitimate, nondiscriminatory reason for the adverse actions it took against Mr. Asghar. If the Defendant did so, Mr. Asghar would then be required to make a showing that the reasons articulated by the agency are not the true reasons, but are rather a pretext for discrimination.

B.   Retaliation

Pursuant to Section 704(a) of the Civil Rights Act of 1964, it is an unlawful employment practice for an employer to discriminate against any employee or applicant for employment "because [the employee or applicant] opposed any practice made an unlawful employment practice by this title, or because he has made a charge, testified, assisted, or participated in any manner in the investigation, proceeding, or hearings under this title."

To state a prima facie claim of unlawful retaliation, a plaintiff must show:
a) that she engaged in activity protected by Title VII of the Civil Rights Act of 1964;
b) that her employer took adverse employment action against her; and
c) that a causal connection existed between the protected activity and the adverse action.

A plaintiff has a viable hostile environment claim if she can demonstrate (1) that she is a member of a protected class, (2) that she has been subjected to unwelcome harassment, (3) that the harassment was based on membership in the protected class, and (4) that the harassment is severe and pervasive enough to affect a term, condition or privilege of employment. Harris v. Forklift Sys., 510 U.S. 17, 21 (1993)   (A hostile work environment exists "when the workplace is permeated with `discriminatory intimidation, ridicule and insult' . . . that is `sufficiently severe and pervasive to alter the conditions of the victim's employment and create an abusive working environment."). See Daka Inc. v. McCrae, 839 A.2d 682, 701 (D.C. 2003) n.15; Lively v. Flexible Packaging Association, 803 A.2d 874, 889, 892 (D.C. 2003) (and cases cited therein) (A hostile work environment claim by its "very nature . . . involves repeated conduct . . . based on the cumulative effect of individual acts"; thus, to satisfy limitations only "one `act contributing to the claim' [need] occur within [the statutory period].") (quoting *AMTRAK v. Morgan,* 536 U.S. 101, 115 (2002).

The Supreme Court has emphasized that Title VII's prohibition "is not limited to `economic' or `tangible' discrimination." *Meritor Savings Bank FSB v. Vinson,* 477 U.S. 57, 64, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). Rather, "[w]hen the workplace is permeated with `discriminatory intimidation, ridicule, and insult' that is `sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' Title VII is violated." *Harris v. Forklift Sys.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (quoting *Meritor Savings Bank,* 477 U.S. at 65, 67, 106 S.Ct. 2399); *see also Harvill,* 433 F.3d at 434.

For harassment to be sufficiently severe or pervasive to alter the conditions of the victim's employment, the conduct complained of must be both objectively and subjectively offensive. *Harris,* 510 U.S. at 21-22, 114 S.Ct. 367. Thus, not only must the victim perceive the environment as hostile, the conduct must also be such that a reasonable person would find it to be hostile or abusive. *Id.* To determine whether the victim's work environment was objectively offensive, courts consider the totality of the circumstances, including (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or merely an offensive utterance; and (4) whether it interferes with an employee's work performance. *Id.* at 23, 114 S.Ct. 367. No single factor is determinative. *Id.* A showing that the employee's job performance suffered is simply a factor to be considered, not a prerequisite. *Mota v. Univ. of Tex. Houston Health Sci. Ctr.,* 261 F.3d 512, 524 n. 33 (5th Cir.2001). As the Supreme Court stated, "even without regard to ... tangible effects, the very fact that the discriminatory conduct was so severe or pervasive that it created a work environment abusive to employees because of their race, gender, religion, or national origin offends Title VII's broad rule of workplace equality." *Harris,* 510 U.S. at 22, 114 S.Ct. 367.

Under the totality of the circumstances test, a single incident of harassment, if sufficiently severe, could give rise to a viable Title VII claim as well as a continuous pattern of much less severe incidents of harassment. *See Harvill,* 433 F.3d at 435-36; *El-Hakem v. BJY Inc.,* 415 F.3d 1068, 1073 (9th Cir.2005) ("`The required level of severity or seriousness varies inversely with the pervasiveness or frequency of the conduct.'") (quoting *Nichols v. Azteca Rest. Enters., Inc.,* 256 F.3d 864, 872 (9th Cir.2001)); *Cerros v. Steel Techs., Inc.,* 288 F.3d 1040, 1047 (7th Cir.2002) (stating that severity and

pervasiveness are, "to a certain degree, inversely related; a sufficiently severe episode may occur as rarely as once, while a relentless pattern of lesser harassment that extends over a long period of time also violates the statute.") (citation omitted).  The Fifth Circuit has found that a regular pattern of frequent verbal ridicule or insults sustained over time can constitute severe or pervasive harassment sufficient to violate Title VII. *See, e.g.,* *Walker v. Thompson,* 214 F.3d 615, 626 (5th Cir. 2000) (holding that African-American employees who were subjected to a variety of racial slurs over three-year period raised fact issue as to whether slurs were sufficiently severe or pervasive to violate Title VII); *Farpella-Crosby v. Horizon Health Care,* 97 F.3d 803, 806 (5th Cir.1996) (plaintiff presented sufficient evidence from which a jury could find severe or pervasive harassment where plaintiff was subjected to offensive, sex-based comments two to three times per week).

C.     Mr. Asghar has Established A Claim of Discrimination and a Hostile Work Environment Under  Title VII Based on His Race, National Origin and Religion.

The Agency argues that Mr. Asghar cannot establish a claim of a hostile work environment because he was not subjected to intimidate, ridicule and insult sufficiently severe to alter the conditions of his employment.

A single incident of harassment may be sufficiently severe or pervasive to establish a hostile work environment claim.  It is not disputed that Mr. Asghar was accused of being a terrorist and prevented from returning to work because he is from Afghanistan and he traveled to that country on family business in 2004. When Mr. Asghar returned from Afghanistan, he was prevented from returning to work on November 8, 2004 and lost three weeks of pay, and was subjected to an investigation which included

11

interrogation by the FBI. Thus, he was subjected to an adverse because of his race and or national origin. This treatment occurred because a supervisor was biased against Islam and believed it was a violent religion, and stated she believed that Mr. Asghar could be a terrorist on two occasions or could bring a bomb into the building. This is the type of single incident which is sufficiently severe to constitute a hostile work environment.

Further, here the harassment, when considered together and viewed in the light most favorable to Mr. Asghar, shows a long-term pattern of ridicule sufficient to establish a claim under Title VII. *See, e.g., Walker,* 214 F.3d at 626; *Farpella-Crosby,* 97 F.3d at 806; *Hussain v. Highgate Hotels, Inc.,* 126 Fed.Appx. 256, 268-69 (6th Cir.2005) (plaintiff who was called "Taliban" on a regular basis by co-workers raised issue of fact on hostile work environment claim under state civil rights statute). Applying the totality of the circumstances test, there is sufficient evidence to create an issue of fact as to whether the harassment that Mr. Asghar suffered was so severe or pervasive as to alter a condition of his employment. The evidence demonstrates that Mr. Asghar was subjected to verbal harassment on a regular basis for a period of years which resulted in multiple claims of discrimination. The Agency refused to take any action to bring about an end to the harassment. During that time, Mr. Asghar was initially believed to be Palestinian and called names such as bomb maker and rock thrower. He was later mocked as Osama Bin Laden with employees wearing turbans, and accused of being a terrorist, interrogated by the Agency security and the FBI because he traveled to Afghanistan, and called "Chemical Ali". He was sporadically subjected to additional incidents of harassment, such as his supervisor's comments, which suggested that he could be a terrorist and could

12

attack the United States. A factfinder could reasonably conclude that this conduct was also motivated by animus stemming from Mr. Asghar's religion and national origin.

In addition, the evidence is sufficient to show that the harassment Mr. Asghar suffered was based on his race, religion and national origin. First, some of the alleged harassment dealt specifically with Mr. Asghar's Muslim faith, including: (1) mocking his faith by wearing a turban; and (2) telling him that Islam is a violent religion. Also, a factfinder could reasonably infer that the comments suggesting that Mr. Asghar was a terrorist or could bring a bomb into the Agency were based on his national origin and religion.

With respect to national origin, a party is able to establish a discrimination claim based on its own national origin even though the discriminatory acts do not identify the victim's actual country of origin. The EEOC's guidelines on discrimination define "discrimination based on national origin" broadly, to include acts of discrimination undertaken "because an individual has the physical, cultural or linguistic characteristics of a national origin group." 29 C.F.R. § 1606.1. Nothing in the guidelines requires that the discrimination be based on the victim's actual national origin. The EEOC's final guidelines make this point clear:

In order to have a claim of national origin discrimination under Title VII, it is not necessary to show that the alleged discriminator knew the particular national origin group to which the complainant belonged. . . . [I]t is enough to show that the complainant was treated differently because of his or her foreign accent, appearance, or physical characteristics. Guidelines on Discrimination Because of National Origin, 45 Fed.Reg.

13

85,632, 85,633 (Dec. 29, 1980); *see also Langadinos v. Appalachian Sch. of Law,* No. 1:05CV00039, 2005 WL 2333460, at *1 n. 6 (W.D.Va. Sept. 25, 2005) ("The plaintiff may still establish a cause of action under the Civil Rights Act despite the defendant's mistaken belief that his ethnic characteristics are those of a person of Italian, rather than Greek, descent."); *Kanaji v. Children's Hosp. of Philadelphia,* 276 F.Supp.2d 399, 401-04 (E.D.Pa.2003) ("Defendant fails to cite a single case where a court has held that a plaintiff alleging `national origin' discrimination must specify a `country' or `nation' of origin."); *LaRocca v. Precision Motorcars, Inc.,* 45 F.Supp.2d 762, 770 (D.Neb.1999) ("The fact that [co-worker] ignorantly used the wrong derogatory ethnic remark toward the plaintiff is inconsequential.").

In this case, the evidence supports the claim that Mr. Asghar was harassed based on his national origin, race and religion.

This case is factually and legally similar to E.E.O.C. v. Wc&M Enterprises, Inc., 496 F.3d 393 (5th. Cir. 2007). There the Fifth Circuit Court of Appeals reversed a district court's dismissal of a complaint of discrimination, where an employee, Mohommed Rafiq, a car salesman in Conroe, Texas. Rafiq, and native of India and a practicing Muslim, alleged that on September 11, 2001, he arrived at work for his afternoon shift on that day, a number of his co-workers and managers, were watching television coverage of the attacks, and upon seeing Rafiq, one employee called out, "Hey, there's Mohommed," and another said, "Where have you been?", in a mocking way, which caused everyone to laugh. Over a period of a year, Rafiq was harassed and the supervisors and colleagues implied that he had participated in some way in the terrorist

14

attacks against the United States."   After the United States took military action against Afghanistan later in 2001, employees began calling Rafiq "Taliban" whenever they saw him and others later told him he should go back to where he came from.  The harassment continued over his protests.  Later, Rafiq was accused of being a "Muslim extremist" and terminated.     The Fifth Circuit found that Mr. Rafiq was subjected to a hostile work environment and reversed the district court.

 According to the Agency, Mr. Asghar did not suffer any discrimination because there was no adverse personnel action because "at most, he was the subject of a brief (3 week) investigation during the period he was on leave." Motion at 22.  The Agency ignores the fact that there was no basis for this investigation other than the Agency's bias, and the investigation resulted in Mr. Asghar losing three weeks of pay.  Mr. Asghar returned to work in early November 2004, and met with his supervisors, and advised his supervisors that he had returned from his leave of absence early and was prepared to return to work. According to Mr. Asghar, he met with his supervisors and told them he was ready to return to work and his supervisors responded that it would be permissible. Mr. Asghar reported for work on November 8, 2004, and his ID badge had been deactivated, and he was prevented from returning to work.

 Contrary to the agency's argument, the actions taken against Mr. Asghar were adverse actions. An employment action rises to the level of an actionable adverse action if there is a tangible change in the duties or working conditions constituting a material employment disadvantage.  See Stewart v. Evans, 275 F.3d 1126, 1134 (D.C. Cir. 2003). "A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different

15

responsibilities, or a decision causing a significant change in benefits." Burlington Indus., Inc. v. Ellerth, 524 U.S. 724, 761 (1998).

In the Circuit Court for the U.S. Court of Appeals for the District of Columbia Circuit, adverse actions are those that result in "changes such as demotion, undesirable reassignment, or the loss of a bonus," but not those that impose "purely subjective harms, such as dissatisfaction or humiliation." Velikonja v. Mueller, 315 F. Supp. 2d 66, 75 (D.D.C. 2004) citing Russell, 257 F.3d at 819, Forkkio, 306 F.3d at 1130-31. A loss of pay or benefits may constitute an adverse action, but an employee may suffer an adverse action even in the absence of "reduction in grade, pay, or benefits." Holcomb, 433 F.3d at 9032. Temporary changes or a decrease in the quality of responsibilities may constitute adverse action. Holcomb v. Powell, 433 F.3d 889, 902-03 (D.C. Cir. 2006).

Here, Mr. Asghar was prevented from returning to work for three weeks, and therefore suffered a loss of pay. This was an adverse action. Based on Plaintiff's evidence, a reasonable trier of fact could conclude that the plaintiff has suffered objectively tangible harm.

The Agency argues that even if Mr. Asghar suffered an adverse personnel action, there were legitimate, non-discriminatory, nonretaliatory reasons for the action taken. Here, the Agency contends that there were discrepancies in the reasons for the travel. This claim is disputed. There were no discrepancies in the reasons for his travel. Mr. Asghar reported to his supervisors that he needed to travel to Afghanistan to attend to family matters. Mr. Asghar did not tell Felicia Jackson that his mother was critically ill, suffering from cancer and not expected to live. This claim was simply made up by the Agency. There was no discrepancy in the reasons he provided for traveling to

16

Afghanistan. When he returned from Afghanistan, he provided the same reason for his travel to the Agency's security director, Mr. Alonso, that he had given prior to his departure. Despite there being absolutely no evidence to support a claim that Mr. Asghar could be a terrorist, Mr. Asghar was referred to the FBI for an investigation and interrogation. At the conclusion of the interrogation by Alonso, Alonso told Mr. Asghar that the FBI would be contacting him at his home and that he could not leave the area and should remain at home. Later, armed FBI agents arrived at Mr. Asghar's home and interrogated him for 45 minutes. Mr. Asghar's pregnant wife was distraught and later had a miscarriage. The reasons for the actions taken against Mr. Asghar were discriminatory.

Plaintiff has established that he was suspended for three weeks because he traveled to Afghanistan and there were no legitimate reasons for the actions taken against Mr. Asghar and his family. It is not disputed that Mr. Asghar was suspended for three weeks without pay because his supervisor reported that he traveled to Afghanistan, and he was labeled as a possible terrorist and someone who might bring in a bomb and blow up the building. The Agency could have placed Mr. Asghar on paid administrative leave pending the outcome of any investigation rather than the drastic, discriminatory action that it took against him.

D.     Mr. Asghar has Established a claim of Retaliation.

The Agency argues that Mr. Asghar cannot establish a prima facie case of retaliation because the prior protected activity was in 1996-1998 and 1999 –2000, and the latest incident did not occur until 2004. This claim is disputed. The prior EEO claims

which included claims of a hostile work environment, were resolved in 2002. According to Mr. Asghar, the discrimination continued from 2002 through 2004.

The Agency then argues that even if there was a causal connection, there was no material adverse personnel action. Here, the Agency asserts that the individual who conducted the investigation and presumably was responsible for Plaintiff's injuries was Glenn Alonso and he was not an alleged discriminating official in this action. Motion at 19.

Mr. Asghar asserts that his prior claims were filed against his supervisors, James Brent and Felicia Jackson, both African Americans, and these are the individuals who are chiefly responsible for the harm to him. The prior EEO actions were settled in 2002. He complains, however, that the racial harassment continued in 2002 through 2003, when Mr. Asghar was removed from an acting supervisor position. In 2004, Ms. Jackson accused Mr. Asghar of being a terrorist, and stated he could bring a bomb into the building. When he returned to work, he was called "Chemical Ali" by his co-workers."

Conclusion

The motion to dismiss should be denied, and material facts are in dispute and the motion for summary judgment should be denied as well.

>  Respectfully submitted,
>           /s/
>  David A. Branch #438764
>  Law Offices of David A. Branch, PC
>  1825 Connecticut Avenue, N.W.
>  Suite 690
>  Washington, D.C. 20009
>  (202) 785-2805 phone
>  (202) 785-0289 fax

Certificate of Service

I hereby certify this 14th day of January 2008 that a copy of the foregoing Plaintiff's Opposition to Motion to Dismiss was sent via electronic mail to counsel for the Defendant at the address listed below:

Claire Whitaker
AUSA- District of Columbia
501 3rd Street, NW Fourth Floor
Washington, DC 20001                    /s/
                                                          _____
                                                          David A. Branch