UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ALI ASGHAR, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | Civil Action No. 06-0400 (RJL) |
| JOHN W. SNOW, Secretary, ) | |
|     Department of Treasury, ) | |
| ) | |
| Defendant. ) | |
| ) | |

## DEFENDANT'S RESPONSE TO PLAINTIFF'S OPPOSITION

Defendant hereby files his Reply to Plaintiff's Opposition to Defendant's Motion to Dismiss or, In the Alternative, for Summary Judgment ("Plaintiff's Opposition"). The supporting documents to Defendant's Motion are referred to in this filing as "Attachment _" and the page number, or Defendant's Statement of Material Fact, "SMF __", are found at Docket Entry # 20 (November 20, 2007).

### I.    INTRODUCTION

Plaintiff Ali Asghar is employed as a Currency Checker/Processor with the Bureau of Engraving and Printing ("BEP"), Department of Treasury, within the Federal Reserve Vault. He alleges that he was subjected to discrimination based on his national origin (Afghanistan), race (Asian), religion (Muslim), and in retaliation for prior EEO activity in 2002, upon his return in November 2004 after a lengthy trip to Afghanistan. Specifically, he alleges that his return to work was unlawfully delayed for approximately three weeks pending a security investigation taken in connection with the discovery of

conflicting information relating to his reasons for traveling to Afghanistan. Attachment 2.[1]

When Plaintiff returned from Afghanistan and attempted to enter the BEP building on November 2, 2004, his badge had been "redlined," which prevented him from entering the building as an employee.[2] Thereafter, he was questioned by the Security staff concerning his travel to and contacts in Afghanistan. Plaintiff's Opposition, Asghar "undated" Declaration, dated January 10, 2008, at ¶16. The alleged discriminatory/retaliatory actions are the delay in permitting him to report back to work after his four-month absence between November 2, 2004, and November 23, 2004, while the matter was being investigated, and a singular incident in January 2005, respectively. Id., see also SMF, ¶ 2.[3]

On November 20, 2007, and after the close of discovery, Defendant filed a Motion to Dismiss or for Summary Judgment ("Defendant's Motion"). In Defendant's Motion, Defendant demonstrated that Plaintiff had failed to establish a *prima facie* case of discrimination, retaliation, or hostile work environment. Docket Entry #20.

---

[1] This was his second lengthy trip to Afghanistan in an eight-month time frame. His first visit to Afghanistan was from March 2004 until the end of May 2004. Attachment 2 at p. 18. He sought leave for his second trip which was between July 6 and December 31, 2004. Attachment 6. Before leaving for his second trip in July 2004, Plaintiff told one of his supervisors that he was traveling to Afghanistan for some family matters and another supervisor that he was going to Afghanistan because his mother was ill. An investigation showed that Plaintiff's mother was already deceased when he took the trip. See Attachment 8 (Alonso Deposition) at pp. 14, 16-18, 27-29.

[2] Plaintiff's recollection is that his badge was "redlined" on November 8, 2004. The actual date on which Plaintiff was prevented from entering the BEP building was November 2, 2004, not November 8, 2004. See Exhibit A, hereto (badge "swipe" records for November 2, 2004).
.
[3] As Plaintiff has failed to address Defendant's Statement of Material Facts Not in Dispute as required by Local Rule LCvR 7(h), the Court may deem them admitted. See infra, Argument, Sec. A.

Defendant also presented documented legitimate nondiscriminatory reasons for its actions, which were not pretextual for a discriminatory animus. Id.

On January 14, 2008, Plaintiff filed his Opposition to Defendant's Motion relying exclusively for his factual representations on his self-serving declaration prepared on January 10, 2008.[4]  Plaintiff has not disputed Defendant's Statement of Material Facts not in Dispute, pursuant to Local Rule LCvR 7(h).  Accordingly, the Court may consider Defendant's Statement of Facts to be deemed admitted.  See infra, at Argument, Sec. A.

.    Of the facts incorporated by Plaintiff in his opposition, there are only two factual representations made by Plaintiff that appear to dispute Defendant's facts.  They are:  (1) that Plaintiff **did not** tell his supervisor, Felicia Jackson, that he was going to visit his sick mother when he went back to Afghanistan in July 2004 (Plaintiff's Opposition at p. 5), and, (2) that Plaintiff attempted to report for work on November 8, 2004 (Id. pp. 6 & 15).[5]  These two facts are easily refuted by Plaintiff's own testimony and BEP records. In any event, neither of these facts defeats Defendant's Motion in connection with Plaintiff's discrimination and hostile work environment claims.  With regard to his retaliation claim, even assuming the date offered in Plaintiff's January 2008 affidavit (February 2002) is correct as the date he engaged in prior EEO activity, there is no temporal causal connection between that protected activity and his EEO activity in this case which commenced in early January 2005.  See Attachment 1 (EEO Counsellor's report).

---

[4] Although Plaintiff represents that Plaintiff's counsel has the signed original Affidavit in his file, there is no signed version before the Court in .pdf or other format.

[5] As noted above, the actual date was November 2, 2004. Exhibit A, hereto (BEP swipe records).

3

## II.   ARGUMENT

### A. Defendant's Statement of Material Facts Not in Dispute May be Deemed Admitted.

Local Rule LCvR 7(h) requires that "[a]n opposition to [a motion for summary judgment] shall be accompanied by a separate concise statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated, which shall include references to the parts of the record relied on to support the statement."  In the absence of such a statement, "the court may assume that facts identified by the moving party in its statement of material facts are admitted." Id. Defendant submits that in the absence of the required statement by Plaintiff, and his reliance solely on his bald declaration of January 10, 2008, Defendant's Statement of Facts ("SMF") should be deemed admitted.

### B. BEP's Security Office's Actions in Questioning Plaintiff When He Returned from Afghanistan and in Contacting the FBI when Discreprancies Surfaced Concerning His Travel, including the Fact that Plaintiff's Mother Was Already Deceased were Based on Legitimate Nondiscriminatory/nonretaliatory Reasons.

Plaintiff argues in his opposition that management had "no reason" to report his travel or to conduct an investigation. See Plaintiff's Opposition at p. 15.  However, the record shows otherwise.  It was the practice of the BEP to require supervisors to report extended overseas trips by its employees to the Office of Security.  Attachment 8 (Alonso Deposition), p. 11, lines 16-21; p. 12, lines 1-11, p. 13, lines 8-21, p. 14, lines 1-7.  After Plaintiff's second line supervisor contacted the Office of Security, Mr. Glen Alonso of the Office of Security was assigned to investigate the matter.  Id. at p. 12, lines 2-3; SMF at ¶ 8. During his investigation, Mr. Alonso learned that management believed

4

the reason for Plaintiff's second trip to Afghanistan was based on his need to be near his critically ill mother. Id., p. 15, lines 15-20; SMF at ¶10. However, in the course of Mr. Alonso's review of the matter, he found that Plaintiff's security folder reflected that Plaintiff's mother was deceased. Id., p. 16, lines 3-21; SMF at ¶11. Mr. Alonso became "suspicious." Id., lines 14-18; SMF at ¶ 12-¶ 13. Clearly, he had legitimate nondiscriminatory/retaliatory reasons to question Plaintiff upon his return from Afghanistan to explain the discrepancies.

In addition, although Plaintiff was not expected to return to the BEP until after December 31, 2004, he unexpectedly visited the Bureau in early November 2004. See Attachment 6; SMF at ¶ 14. When he did, a security video tape was recorded showing Plaintiff entering the BEP building carrying a rolled rug, the contents of which were not discernible. Attachment 8 (Alonso Deposition), p. 24, lines 12-21; p. 25, lines 1-21. This video again gave Mr. Alonso suspicion. He decided to "red line" or cancel plaintiff's employee badge, pending his questioning Plaintiff. Id. Accordingly, when Plaintiff returned to the BEP building a few days later [on November 2, 2004], he was apparently on his way to the Credit Union. Attachment 8 (Alonso Deposition), p. 27, lines 8-18. On that day, he was denied access, Mr. Alonso was contacted and came to the entrance, and then escorted Plaintiff to his office to question him. See Id., p. 13, lines 8-21, p. 14, lines 1-3, p. 27, lines 8-21, p. 28, lines 1-18.[6] Nothing in this conduct suggests that there was any reason, except security, for the actions taken.

---

[6] Mr. Alonso imposed this restriction on Plaintiff's badge for security reasons. Alonso Deposition, p. 24, lines 1-11; p.26, lines 7-10; p. 27, lines 8-20; p. 37, lines 2-8; p. 11, lines 11-21; p. 12, lines 7-21; p. 13, lines 8-21; p. 16, lines 3-21; p.17, lines 1-21; p. 18, lines 7-18; p. 24, lines 1-5. Thus, when Plaintiff entered the Bureau facility, Mr. Alonso escorted Plaintiff to the Credit Union, and then to Mr. Alonso's office for an interview. Glen Alonso's Affidavit (ROI) p.2; Alonso Deposition, p. 27, lines 8-21; p.28, lines 1-21; p. 30, lines 1-19; p.37, lines 2-8, lines 14-21; Asghar Deposition, p. 130, lines 12-17.

5

Indeed, the conflicting information, together with video footage of Plaintiff's first entry into the BEP building after his travel afforded the BEP Security staff sufficient cause and concern to question Plaintiff about his travel. Attachment 8, p. 22, lines 8-12; SMF at ¶ 16.

Plaintiff suggests that the agency overreacted when Mr. Alonso allegedly stated to Plaintiff during the interview that he (Plaintiff) "might have been involved with [] terrorist group" activity since the last time they spoke. See e.g., Attachment 4 (Asghar Affidavit ROI), p. 63. However, Mr. Alonso acted prudently and properly under the circumstances. Mr. Alonso informed Plaintiff that he was questioning him due to directives regarding foreign contacts, which required him to inquire about travel outside of the United States – especially if it involved travel to certain countries. Afghanistan was clearly one of the countries of concern due to the US conflict in Afghanistan in this post-September 11, 2001 era. Mr. Alonso also informed Plaintiff that he had to ensure that Plaintiff was not being blackmailed or requested to join a subversive group. Attachment 8 (Alonso Deposition), p. 28, lines 1-18. Moreover, it was standard practice within the Bureau's Office of Security to question individuals who were on extended leave while traveling abroad. Id., p. 13, lines 8-21; p. 14, lines 1-3.

Mr. Alonso also informed Plaintiff that he [Mr. Alonso] had contacted the Federal Bureau of Investigations' Terrorism Task Force when the discrepancies surfaced regarding the circumstances of Plaintiff's travel to Afghanistan, and he believed that an FBI agent would talk to Plaintiff. Attachment 4 (Alonso Affidavit (ROI)), p. 2; Attachment 8 (Alonso Deposition), p. 37, lines 14-21, and Attachment 4 (Plaintiff's Affidavit (ROI)), p. 63. Plaintiff was, in fact, interviewed by the FBI on or about

6

November 23, 2004.  Plaintiff's Opposition, Asghar Declaration, ¶ 18.  On November 26, 2004, Mr. Alonso notified Plaintiff that the FBI had completed its investigation, and Plaintiff was able to return to work.  He returned to work at the Bureau on November 29, 2004.  Attachment 8, p. 46, lines 19-21, p.47, lines 1-13; R. 1 at ¶ 14.

As the foregoing establishes, there is no evidence in the record that the actions were taken because of Plaintiff's national origin, race, religion or any other unlawful reasons and Plaintiff has not offered any in his Opposition.

### C. Plaintiff's Supervisors Acted Prudently When They Reported Plaintiff's Travel and Conflicting Reasons to the BEP Office of Security.

While Plaintiff was on his second four-month trip to Afghanistan in 2004, one of his supervisors, Ms. Felicia Jackson, discovered that there was a discrepancy between what he told her, i.e., that his mother was ill, and what he had told another supervisor concerning the reasons for his extended trip.  See SMF at 5, 6 & 7.  Ms. Jackson reported the discrepancy to her superior, Mr. James Brent, who in turn reported Plaintiff's extended travel to the BEP Office of Security.  Attachment 9, pp. 101, 156.

In his Opposition, Plaintiff denies that he reported that his mother was ill, and alleges that he **did not** tell his supervisor, Felicia Jackson that "his mother was critically ill, suffering from cancer and not expected to live."  Plainitff's Opposition, Asghar Declaration dated January 10, 2008, ¶ 13.  However, in a sworn affidavit dated June 16, 2005, **Plaintiff did admit that he informed Ms. Jackson that his step-mother in Afghanistan [who he referred to as his mother] was ill.**  See Attachment 4, pp. 64-65.  He further admitted that **"[m]y stepmother had been ill during my prior visit and when I returned to Afghanistan [in July 2004], her condition had worsened.  In fact, she died while I was there."** Id. at p. 62.  In addition, when submitting his leave slip for

7

travel to Afghanistan in July 2004, Plaintiff relied on illness of a family member to take a four-month leave of absence without pay.  As the basis for his leave, he invoked the provisions of the Family Medical Leave Act of 1993, which authorizes leave for the care of a family member, and checked the box on the leave slip that indicated that the leave was needed "serious health condition of spouse, son, daughter or parent."  <u>See</u> Attachment 6 (leave slip).  Thus, Plaintiff cannot defeat summary judgment with an unsupported declaration, and one that contradicts earlier sworn testimony. <u>Burke v. Gould</u>, 286 F.3d 513, 520 (D.C. Cir. 2002) (*citing* <u>Celotx Corp. V. Catrett</u>, 477 U.S. 317, 320 (1986).

Ms. Jackson verified that before Plaintiff's July 2004 trip, he informed her that his mother was ill and that he was returning to Afghanistan, presumably to take care of her. <u>See</u> Attachment 10 (Jackson Deposition) p. 34, lines 2-6, 15-20; p. 35, lines 1-14.  However, after Plaintiff was on leave in Afghanistan, Ms. Jackson learned that he offered a different reason to another supervisor.  <u>Id.</u> at  p. 35, lines 15-17.   Furthermore, a third supervisor understood that Plaintiff's reason for returning to Afghanistan was to care for his critically ill mother. <u>See</u> Attachment 8, p. 59, lines 1-21; p. 60, lines 1-2.

Thus, Ms. Jackson acted prudently, and without unlawful intent, in reporting the discrepancies to her supervisor.  There is no evidence that any unlawful reason motivated this conduct and Plaintiff has not presented any in his Opposition.

### D. Plaintiff Has Not Carried His Burden of Establishing a Prima Facie Case of Discrimination.

#### 1. Plaintiff has Offered No Evidence Of Disparate Treatment.

In his Opposition, Plaintiff argues that he was treated differently from others based on his race, national origin and religion.  Plaintiff's Opposition at pp. 7, 13.

However, he has failed to present even a scintilla of evidence to support this fact. He points to no other similarly-situated employee, not of his protected class[es] who was treated differently than he in connection with his claims. Indeed, Plaintiff's Opposition simply provides a legal standard for disparate treatment [p. 7] and offers case citationS from other jurisdictions to support his claim [p. 10-12]. There are no factual representations whatsoever to establish his disparate treatment claim. Defendant submits that Plaintiff's proffer is insufficient to establish a *prima facie* case of discrimination based on Plaintiff's race, national origin or religion.

### 2. **Plaintiff Has Not Suffered An Adverse Action**

In his Opposition, Plaintiff also alleges that he suffered an adverse personnel action because the Bureau's security investigation "resulted in Mr. Asghar losing three weeks of pay." Plaintiff's Opposition at p. 15. This is a newly contrived rationale and is not supported by the record.

Plaintiff submitted a leave slip on June 16, 2004, requesting leave without pay (LWOP) from July 6, 2004 until December 31, 2004. Attachment 6. There is no evidence in the record that this leave slip was withdrawn. Indeed, Plaintiff admitted at his deposition that he did not withdraw the leave slip at any time before his return to work on November 29, 2004. See Exhibit B (Excerpt from Asghar Deposition), p. 260, lines 19-22; p. 261, line 1.[7] Moreover, there is evidence in the record that Plaintiff did not intend to return to work until January 2, 2005, at the earliest given the New Years' day holiday. This is reflected in his interview with Mr. Alonso. See Attachment 9 (Alonso's handwritten notes taken contemporaneously with his interview of Plaintiff);

---

[7] These pages of the deposition were not included in R. 20.

see also Attachment 8 (Alonso Deposition), p. 37, lines 17-21; p. 38, lines 1-6; p. 41, lines 19-21; p. 42, lines 1-9; p. 43, lines 11-21; p. 44, lines 1-21, p. 46, lines 10-15.

Based on Plaintiff's specific request for leave without pay and his statements to Mr. Alonso, it was clear that he did not intend to resume work until January 2005. See also SMF at ¶ 17. Thus, Plaintiff did not anticipate receiving his salary during that time period.

In his Opposition, Plaintiff alleges that he returned to the Bureau on November 8, 2004 [actually November 2, 2004] to report to work. Plaintiff's Opposition, Affidavit of January 10, 2008, p. 5. However, the employee badge swipe records for November 2, 2004, show that Plaintiff attempted to enter the BEP building at 9:51 a.m. See Exhibit A, hereto. As his regular tour of duty began at 4:30 a.m. and ended at 1:00 p.m [Attachment 6], if Plaintiff was attempting to enter the BEP building to resume work on November 2, 1999 as he now alleges, he was already 5 ½ hours late. See Exhibit A. Moreover, it is undisputed that when he entered the BEP building, he was on his way to the Credit Union. See Attachment 9 (Glen Alonso's Affidavit (ROI)) p.147.

Defendant submits that there are sufficient reasons for this Court to determine that Plaintiff had no intention of returning to work on November 2, 2004, or at anytime before January 1, 2005. However, even if the Court were to conclude that the Plaintiff did attempt to return earlier than his leave slip reflects, the agency had legitimate nondiscriminatory/nonretaliatory reasons, that were not pretext for discrimination or retaliation, for preventing his return pending a security investigation.

  **E.**  **Plaintiff Has Failed to Establish a Claim of Retaliation.**

    **1. There is No Causal Connection Between Plaintiff's Prior EEO Activity and the Underlying Action in this Case.**.

The record shows that Plaintiff's prior EEO activity was in 1996-1998 and 1999-2000. SMF at ¶ 1. Plaintiff states that he participated in EEO activity in February 2002.

Plaintiff's Opposition, Asghar Declaration at ¶ 8. However, even applying Plaintiff's EEO activity date, it is evident that more than thirty-five months had elapsed between the prior EEO activity and Plaintiff's protected activity in this case. Although Plaintiff suggests that he was continuously the victim of discrimination, retaliation and hostile work environment, he failed to seek EEO counseling or engage in any other protected activity. Indeed, Plaintiff was not even in the workplace in 2004, except for a brief period in the summer between his two trips to Afghanistan and for three weeks from November 29, 1999, until the shutdown in December. Plaintiff has failed to show temporal proximity between the 2002 protected activity and the January 2005 protected activity in this case. Thus, he cannot establish a prima facie case of retaliation. See Clark County Sch. Dist. V. Breeden, 532 U.S. 268, 273 (2001) (20-month period suggests "no causality at all."); Mayers v. Laborers' Health & Safety of N.A. 478 F.3d 364, 369 (D.C. Cir. 2007) (eight or nine months is too long).

### 2. Plaintiff Has Failed to Establish an Adverse Action.

As set forth above, Plaintiff has failed to establish that he suffered an adverse action by the agency's actions. See Argument, Sec. II.D.2. Plaintiff remained in a leave without pay status during the entire period of which he complains as he had previously requested in his approved leave slip. See Attachment 6. Although Plaintiff alleges in his opposition that he was suspended between November 2 and 29, 2004 [Opposition at 17], there is no evidentiary basis for this representation. In fact, no disciplinary action ever resulted from the investigation.

### F. Plaintiff has Failed to Establish that He was the Victim of a Hostile Work Environment

In his Opposition, Plaintiff alleges that he was the victim of a hostile work environment. Plaintiff's Opposition at pp.1 & 9. This allegation is based solely on his

unsupported representation that he "endured years of a hostile work environment." Opposition at p. 1. As set forth below, Plaintiff has failed to carry his burden of establishing a *prima facie* case of hostile work environment.

The parties agree that the appropriate standard for establishing a hostile work environment claim requires the plaintiff to demonstrate that the offensive conduct permeates the workplace and is severe and pervasive enough to alter the conditions of employment. Barbour v. Browner, 181 F.3d 1342, 1347-48 (D.C. Cir. 1999); Harris Forklift Sys., 510 U.S. 17, 21 (1993). The parties also agree that the court must apply a totality of circumstances test to determine whether a reasonable person would find the environment hostile or abusive. Thus, to demonstrate severe or pervasive harassment, the conduct must be both objectively and subjectively offensive. Harris at 21-22.

Plaintiff has failed to satisfy these requirements. On the contrary, Plaintiff has only speculated that the Bureau's investigation and his subsequent delayed return to work was based on discriminatory or retaliatory factors. Plaintiff merely cites isolated comments in an attempt to portray a hostile work environment. In one instance, Plaintiff alleges that Ms. Jackson speculated to two co-supervisors that Plaintiff might be a terrorist who might "bring a bomb into the building . . ." Attachment 4 (Asghar Affidavit-ROI), p. 63. Even if this comment was made, Plaintiff was not in the office at the time and, therefore, he could not have been the victim of a hostile work environment based on the comment. Plaintiff was not in the work environment before November 29, 2004, and there are no discernible allegations of a hostile work environment between that date and January 5, 2005.

Upon Plaintiff's return to work in January 2005, he alleges that Ms. Jackson made a derogatory comment in front of his co-workers about whether he had time to be the father of his unborn child as he was gone for several months. Id. at p. 64; Attachment 10 (Jackson Deposition), p. 72, lines 11-21, p. 73, lines 1-13. However, even if this comment was meant to be derogatory, its content is not related to Plaintiff's national origin, race, religion or any other protected class. In addition, Ms. Jackson realized that the comment, which she meant as a joke, was inappropriate and apologized to Plaintiff. Id.; see also SMF at ¶¶ 23-24. It cannot be viewed by a reasonable person as severe or pervasive enough to create an objectively hostile or abusive work environment. Plaintiff admits that Ms. Jackson did not utter any other derogatory remarks to him during the three week time period at issue in this case – November 29, 2004 to January 5, 2005. Exhbit B, hereto (Plaintiff Deposition, p. 215, lines 15-19).[8]

Finally, Plaintiff alleges that a co-worker called him "Chemical Ali" on his first day back to work. Attachment 4 at p. 64. When Plaintiff asked the co-worker what he meant by this, the co-worker remarked that he was just joking and he refrained from further engaging in this verbal banter. Exhibit B, hereto (Plaintiff Deposition, p. 218, p. 8-14; see also Plaintiff's Opposition at 12-13. He also mentions an incident involving a turban, but cannot remember when it occurred. Plaintiff Deposition, p. 218 at lines 15-21. No frequency is attached to these comments and Plaintiff makes no claim of hostile work environment directed at his co-workers. Exhibit B, p. 222-223. Moreover, he has admitted that only one isolated incident occurred in January 2005. See SMF at ¶ 2; Exhibit B, p. 220, lines 1-10.

---

[8] These pages and the following citations to Plaintiff's deposition were not included in R. 20.

Accordingly, contrary to the dictates in <u>Harris Forlift Sys</u>, Plaintiff has not, and cannot, demonstrate that these comments were severe or pervasive to be deemed both objectively and subjectively offensive.[9]

## CONCLUSION

Based on the foregoing reasons, Defendant respectfully requests that Plaintiff's complaint be dismissed for failure to state a claim, or in the alternative, that Defendant's Motion to Dismiss or for Summary Judgment be granted.

                Respectfully submitted,

                JEFFREY A. TAYLOR, DC Bar #498610
                United States Attorney

                RUDOLPH CONTRERAS, DC Bar #434122
                Assistant United States Attorney

                CLAIRE WHITAKER, DC Bar #354530
                Assistant United States Attorney
                United States Attorney's Office
                Civil Division
                555 4th Street, N.W., Room E-4204
                Washington, D.C. 20530
                (202) 514-7137

OF COUNSEL:

GAIL SERENCO, Esq.
Office of the Chief Counsel
U.S. Department of the Treasury

---

[9] Plaintiff in his opposition seems to imply that Defendant's actions were responsible for his wife's miscarriage. Plaintiff's Opposition at p. 17. That is simply not what he represented at his deposition. Attachment 11, p 153, lines 5-14.